Arthur WIGAND, Individually and suing on behalf of himself and all other stockholders of Flo-Tek, Inc., similarly situated, and in the right of Flo-Tek, Inc., Plaintiffs-Appellees,

v.

FLO–TEK, INC., Harold Kiernan and Claire Kiernan, Defendants.

Appeal of FLO–TEK, INC. and Harold Kiernan, Defendants.

No. 36, Docket 79–7150.

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1979.

Decided Oct. 19, 1979.

As Amended Jan. 14, 1980.

Jack S. Dweck, New York City (Dweck & Sladkus, New York City, Harvey I. Sladkus, Steven J. Mandelsberg, New York City, of counsel), for plaintiff-appellee, Arthur Wigand.

Frank G. Raichle, Buffalo, N. Y. (Raichle, Banning, Weiss & Halpern, Buffalo, N. Y. and Baar, Bennett & Metz, Pearl River, N. Y.), for defendants-appellants, Flo-Tek, Inc. and Harold Kiernan.

Before LUMBARD, MANSFIELD and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

Defendants Harold Kiernan and Flo-Tek, Inc. appeal from a judgment entered against them on January 30, 1979 in the sum of $213,814.44 awarded to plaintiff Arthur Wigand after a nonjury trial before Judge Owen in the Southern District of New York on one count alleging common law fraud and deceit as well as misstatements in the sale of securities, and one count of breach of contract. We affirm the judgment as to liability of the defendants insofar as it is based on the Securities Act of 1933, 15 U.S.C. 77a *et seq.*, but we vacate and remand as to damages because of error in the legal standard applied by the trial court and because of the insufficiency of the evidence supporting the finding as to the value of consideration paid by the plaintiff. We dismiss the breach of contract count for lack of jurisdiction.

Wigand sued individually and as a representative of other shareholders of Flo-Tek, naming Harold Kiernan, President and controlling shareholder of Flo-Tek, as defendant along with Kiernan's wife, Claire, and Flo-Tek itself. In Count I Wigand alleged that Kiernan made false and misleading statements to him in the course of negotiating the acquisition by Flo-Tek of Mid-Hudson Sheet Metal, Inc. ("Mid-Hudson"), a sheet metal fabricating firm of which Wigand was chief executive officer and major shareholder. In Counts II through V Wigand alleged various breaches of fiduciary duty by Kiernan during the period he controlled Mid-Hudson, and in Count VI Wigand alleged breach of an employment contract. Defendants, after an initial default, made several counterclaims, alleging that Wigand had wrongfully appropriated funds of the company and charging abuse of process. Counts II through V, stating a deriva-

tive cause of action, were dismissed by Judge Owen on May 9, 1975, following plaintiff's failure to post the bond required by section 627 of New York's Business Corporation Law. Claire Kiernan was dismissed as a defendant by Judge Owen at the end of the presentation of plaintiff's case. The defendants' counterclaims were dismissed by Judge Owen from the bench at the end of trial. This appeal is not concerned with any of these three matters. After a five day trial beginning on March 22, 1978, Judge Owen found both remaining defendants liable in a decision announced from the bench. On January 25, 1979, Judge Owen filed his findings with respect to damages, assessing the defendants $174,-375.00 in damages on Count I and $39,-439.44 on Count VI, together with interest from May 1, 1978.

Defendant Flo-Tek is a New Jersey corporation engaged in the production of pollution control equipment. Kiernan has been Flo-Tek's president since its formation in 1961. Along with his family, Kiernan owns more than 500,000 of the approximately 650,000 shares of Flo-Tek that have been outstanding since the company became publicly owned in 1970.

Plaintiff Wigand was chief executive officer of Mid-Hudson, a New York corporation with plant and offices in Hopewell Junction, N.Y. The stock of Mid-Hudson consisted of one share, which was owned by Taconic Holding Co., Ltd. ("Taconic"), a New York corporation. Taconic's stock ownership is a matter of uncertainty. Wigand owned five and a half shares of Taconic. Louis Miller owned two and a half shares. Nicholas Noviello held two shares, one in his own name and one in trust for Joseph Green. Finally, one share had been issued to a Mr. Montaldo and one share to a Mr. Powell, but the status of these shares was unclear.[1]

Mid-Hudson's premises adjoined a machine shop engaged in subcontracting work for Flo-Tek. In January or February of 1971, Kiernan, visiting the machine shop, was introduced by its owner to Wigand. Kiernan discussed with Wigand the possibility that Mid-Hudson could do some contract work for Flo-Tek. Thereafter, Mid-Hudson began to manufacture component parts for a prototype trash compactor Flo-Tek was building.

Sometime in the spring of 1971, Kiernan suggested to Wigand that Flo-Tek acquire Mid-Hudson. In the course of their discussions Kiernan made various representations to Wigand which became, along with later statements, the basis for Wigand's claim that he had been fraudulently misled.

Kiernan sent Wigand a "Memorandum of Understanding" dated June 21, 1971, which called for the "transfer of assets and business" of Mid-Hudson to Flo-Tek (Plaintiff's Exhibit 1). In return, Flo-Tek undertook to issue 25,000 shares of unregistered stock to Mid-Hudson and Taconic. On July 1, 1971, Wigand signed the memorandum.

But Taconic's other shareholders were not happy with the proposed arrangement. Louis Miller, who owned two and a half shares and had loaned Mid-Hudson $15,000, did not want to sell out to Flo-Tek, but he made it clear that he would not interfere. Noviello, who controlled two shares and served as Mid-Hudson's lawyer, wrote a letter on August 16, 1971, rejecting the stock for stock deal proposed by Kiernan but offering to sell his share for $8,000 in cash.

Meanwhile Wigand had visited Flo-Tek's offices in Lodi, New Jersey, and had attended a meeting in August to which Kiernan brought John Poole, who represented Chemical Bank. In the course of this meeting, Wigand testified, Kiernan led him to believe that Flo-Tek had lines of credit from New York banks up to five hundred thousand dollars.

---

1. The shares issued to Montaldo and Powell were the subject of litigation in 1971–72. Wigand testified that an agreement had been reached to buy them out for $7,000 apiece, that he was uncertain whether they had been paid, but that they were no longer shareholders by May, 1972. Taconic's shareholder records were not produced at trial, and neither side knew of their whereabouts.

In late August and early September, 1971, floods swept through Lodi, New Jersey, destroying Flo-Tek's offices and records and damaging much of its equipment. With Wigand's permission, Kiernan moved what he could salvage up to Mid-Hudson's premises in Hopewell Junction. In late September, Flo-Tek purchased at auction the machine shop adjoining Mid-Hudson.

On October 1, 1971, Kiernan and Wigand executed an "Agreement" to effect the contemplated acquisition of Taconic and Mid-Hudson by Flo-Tek. The agreement provided for Flo-Tek's acquisition of Wigand's Taconic shares in return for 25,000 shares of Flo-Tek. Wigand warranted in this document that he was the holder of five and a half of nine outstanding shares of Taconic, and that he was under no contractual obligation with regard to voting or selling his Taconic shares. Attached to the agreement were unaudited financial statements of Flo-Tek, Mid-Hudson and Taconic. Among other requirements, the agreement provided that assignments of stock were to be delivered by Wigand to Flo-Tek at a closing, and that Mid-Hudson and Taconic would be kept separate from Flo-Tek for accounting purposes.

Also on October 1, 1971, Wigand and Kiernan signed an employment contract (this contract was called for by the stock acquisition agreement) giving Wigand a salary of $18,200 per year, insurance benefits, business expenses, providing for Flo-Tek to repay Wigand for his loans to Mid-Hudson, and giving Wigand authority to manage Mid-Hudson's business.

Even before the signing of these two agreements on October 1, Kiernan had effectively merged the operations, plant, accounting, work force and materials of Flo-Tek, Flo-Tek's subsidiary Flo-Seal, Taconic, and Mid-Hudson. Wigand retained the authority to sign checks on Mid-Hudson's account, but he regarded Kiernan as his "boss". The day to day obligations of

Flo-Tek were met by payments made from Mid-Hudson's account. Employees of Flo-Tek were paid by checks drawn on Mid-Hudson's account. No attempt was made to keep records of time spent by employees on Mid-Hudson's as opposed to Flo-Tek's work. After October 1, Wigand and Kiernan acted as if an acquisition had been effected. On October 19, 1971, Flo-Tek issued a press release describing its acquisition of Mid-Hudson as complete. In his May 5, 1972 letter to stockholders of Flo-Tek, Kiernan again reported the acquisition of Mid-Hudson.

On May 23, 1972, Flo-Tek issued and its transfer company in New Jersey mailed to Wigand in New York a certificate for 25,-000 unregistered no-par shares. In mid-August, 1972, Wigand, believing that Kiernan was not fulfilling the terms of his employment contract, withdrew $21,157.47 from Mid-Hudson's account, claiming it as due him under the contract, and deposited the money in a joint escrow account with his lawyer. Wigand notified Kiernan of this withdrawal and Kiernan fired him on August 16, 1972. On September 19, 1972, Wigand filed the instant suit.

## I. *Jurisdiction.*

Federal subject matter jurisdiction in this case was predicated on 28 U.S.C. 1332, the general diversity statute, and sections 12(2) and 17 of the Securities Act of 1933, 15 U.S.C. 77*l* and 77q. On the undisputed facts in the record it is clear there is no diversity. Jurisdiction is to be determined as of the commencement of suit. *Smith v. Sperling*, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957). When the complaint in this case was filed on September 19, 1972, the offices and operations of Flo-Tek had been located in Hopewell Junction, N.Y., for approximately a year.[2] New York was the location of Flo-Tek's "principal place of business" and Flo-Tek was thus a

---

**2.** Kiernan testified that Flo-Tek's "clerical office" was moved to Closter, New Jersey, after the Lodi floods, but also testified that this office was shut down in May, 1972 and from then on Flo-Tek's clerical work was also done at Hopewell Junction, New York. Thus there is no need to consider whether the "clerical office" or the Hopewell Junction workplace was Flo-Tek's "principal place of business."

"citizen" of New York under 28 U.S.C. 1332(c), which provides that for diversity purposes a corporation shall be deemed to be a citizen of the state in which it is incorporated and the state where it has its principal place of business. Since plaintiff Wigand was also a citizen of New York in September, 1972, complete diversity among the parties did not exist as required by *Strawbridge v. Curtiss*, 3 Cranch 267, 2 L.Ed. 435 (1806). The parties could not waive this defect, even if, as here, the defendant withdrew his objection to jurisdiction.[3] *Jackson v. Ashton*, 33 U.S. (8 Pet.) 148, 8 L.Ed. 898.

■ The district court properly had jurisdiction under the Securities Act of 1933, however.[4] Although plaintiff failed to allege any use of the mails or instrumentalities of interstate commerce in their complaint, relying instead on the diversity statute, the use of mails is apparent on the record, supporting the district court's findings in this regard. Defendants' transfer agent mailed the certificate of Flo-Tek to Wigand in May, 1972, and such use of the mails is sufficient to support jurisdiction under the 1933 Act. *Schillner v. H. Vaughan Clarke & Co.*, 134 F.2d 875 (2d Cir. 1943).

■ The district court not having diversity jurisdiction over any part of this case, it follows that Count VI of the complaint, alleging breach of Wigand's employment contract with Flo-Tek, should have been dismissed for lack of jurisdiction. Plaintiff's allegations amounted to a contract claim that could be heard in the federal courts (in the absence of any applicable statutory grant of jurisdiction) only under the district court's pendent jurisdiction. The test for the existence of pendent jurisdiction was stated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1133, 16 L.Ed.2d 218 (1966), where the Court said the state and federal claims must "derive from a common nucleus of operative fact." Here the facts relating to Flo-Tek's alleged breach of the employment contract must, of necessity, be events subsequent to the effective date of the contract, October 1, 1971. By contrast, the statements by Kiernan which form the basis of plaintiff's Securities Act claim occurred prior to October 1, 1971.[5]

We are left to consider whether or not there is sufficient evidence on the record to uphold the district judge's finding of liability under the Securities Act and his calculation of damages. Because we find that the record supports a finding of liability under section 12(2), we need not reach the question—as yet undecided in this circuit and not briefed in this case—whether or not section 17(a) of the Securities Act can be the basis for a private right of action. *S. E.*

---

3. Defendants moved for a dismissal of the complaint for lack of subject matter jurisdiction on April 13, 1973. Judge Brieant, to whom the case was then assigned, referred to then-Magistrate Goettel the question of the factual basis for the existence of diversity jurisdiction. A hearing before Magistrate Goettel was held on November 14, 1973, at the close of which defendants conceded the existence of subject matter jurisdiction.

4. Since Flo-Tek is named as a defendant in the caption and the complaint seeks relief with respect to it, the failure to name it in the "heading" of Count I is no defense.

5. The statute of limitations for section 12(2), 15 U.S.C. 77*l*, provides that actions must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." In this case the violation of section 12(2) took place when the sale of Flo-Tek stock was made to Wigand. This sale occurred on October 1, 1971. Since the complaint in the suit was filed on September 19, 1972, the statute did not bar the plaintiff's claim unless Wigand should have discovered the false statements prior to September 19, 1971. It is evident, however, that the limitations period here begins to run only after the sale, because it would be unreasonable to have the limitations period begin to run before the claim accrued, *i. e.*, before the sale occurred. *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875–76 (2d Cir. 1971) (section 12(1)). And plaintiffs pleaded with sufficient particularity the time of the transaction giving rise to liability given the fact that no question of due diligence was involved. Cf. *Brick v. Dominion Mortgage and Realty Trust*, 442 F.Supp. 283, 291–92 (W.D.N.Y.1977). We have noted this because compliance with the statute of limitations in section 12(2) actions is a prerequisite of jurisdiction.

C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 864 (2d Cir. 1968) (en banc) (Friendly, J., concurring).

Section 12(2) of the Securities Act makes liable "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission." 15 U.S.C. 77l.

■ Actions under section 12(2) do not require a showing by the plaintiff of any kind of scienter on the part of the defendant. *Franklin Savings Bank of New York v. Levy*, 551 F.2d 521 (2d Cir. 1977). In this case Judge Owen found that Kiernan had made untrue statements and misleading omissions in the course of convincing Wigand to purchase Flo-Tek stock. There is sufficient evidence on the record to uphold these findings.

■ Kiernan's statements to Wigand went beyond mere puffery in at least two important areas. First, he led Wigand to believe that Flo-Tek had lines of credit with major commercial banks up to $500,000. In fact, Flo-Tek had at most a $100,000 line of credit and the $500,000 figure was based on a commitment by Chemical Bank to finance the purchase of materials for trash compactors to be built by Flo-Tek if and only if Flo-Tek was awarded certain contracts from the City of New York. The award of such contracts depended on Flo-Tek's sub-mitting the lowest bid to the City, and was thus highly contingent.

Second, Judge Owen found that Kiernan had breached a duty to disclose to Wigand the true state of Flo-Tek's financial position. In part because of the destruction of Flo-Tek's business records in the August-September floods of 1971, there were no audited financials for the company available for the eighteen months prior to the Wigand-Kiernan agreement of October 1, 1971. But Kiernan knew that the company had lost money in 1970 and was losing money in 1971, and failed to tell Wigand this.

■ Clearly such misstatements and omissions were material. Judge Owen described Wigand as "a more trusting person in these circumstances than many would be." Wigand failed to seek confirmation of Kiernan's representations and did not request financial statements. But there is no allegation by the defendant that Wigand knew of the falsity of the impression Kiernan gave him. Absent such an allegation, Wigand was not required to show that he relied on Kiernan's representations to recover under section 12(2). *Demarco v. Edens*, 390 F.2d 836 (2d Cir. 1968).

As a final condition to liability under section 12(2), the Act requires "tender" of the securities, if they are still held by the plaintiff. 15 U.S.C. 77l. The language of the section gives no hint as to the time, place or manner of such tender. Those circuits that have reached the question have held that an offer to tender contained in the complaint will suffice.[6] *Chapman v. Dunn*, 414 F.2d 153 (6th Cir. 1969); *Moses v. Michael*, 292 F.2d 614 (5th Cir. 1961); *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269 (10th Cir. 1957).[7] A defendant may be

---

6. In this circuit the only cases discussing the problem of tender under section 12(2) have been *Billet v. Storage Technology Corp.*, 72 F.R.D. 583 (S.D.N.Y.1976), in which the district court dismissed a claim for failure to meet the tender requirement and granted leave to file an amended complaint including an allegation of tender, citing *Stadia, Moses* and *Chapman*; and *Buchholtz v. Renard*, 188 F.Supp. 888 (S.D. N.Y.1960), in which the court refused to dis-miss a claim on failure to tender grounds because the statute sets no exact time for tender and because, on the facts of the case, plaintiffs could not have known the identities of the defendants to whom they might have tendered. *See also Gridley v. Cunningham*, 550 F.2d 551 (8th Cir. 1977) (dictum).

7. These decisions, however, do not by themselves dispose of the case before us. In *Moses,*

held to have waived a defense of failure to tender by not asserting it until appeal. *Moses v. Michael, supra,* at 619.

■ Although plaintiff does not make an explicit offer to tender in his complaint, one part of the complaint can be construed as an offer to tender. In his *ad damnum* clause the plaintiff asks for "rescision" (sic), which could be read as an implied tender. Support for such a reading can be found in *Stadia,* the only appellate opinion to explore the tender requirement of section 12(2) in any depth. In *Stadia* the plaintiffs made their tender subject "to the condition that the defendants pay in full any judgment that the plaintiffs may acquire in the above litigation." 251 F.2d at 273. The court found this condition did not vitiate the effectiveness of the tender:

> The purpose of a tender is to put the parties in status quo. The plaintiffs who have already paid for the stock do not have to give up the stock before they sue for the return of the purchase money. Defendants have not indicated any prejudice to them by the form of the tenders. The stock is held by the clerk of the court. Any question as to the rights of the defendants to delivery of the stock can be determined by the trial court when it arises.
>
> *Id.,* at 274.

The statutory right to rescission under section 12(2) is conditioned on the plaintiff being in possession of the securities. The meaning of rescission is an exchange meant to put the parties in a status quo. Obviously rescission can only take place if the plaintiff gives back the stock he has received, and therefore a demand for rescission contains an implicit offer to tender, sufficient to satisfy the statute. No prejudice to the defendants in this case is apparent from plaintiff's failure to make a more explicit tender.

Additionally, the plaintiff had reason to believe that an offer of tender would be pointless. On July 11, 1974, the Flo-Tek board voted to cancel Wigand's 25,000 outstanding shares. This action shows that plaintiff would have been justified in believing tender at any time before commencement of suit to be useless.

II. *Damages.*

■ Section 12(2) is explicit in allowing the plaintiff no choice of remedy. If plaintiff owns the stock, he is entitled to rescission but not damages. If plaintiff no longer owns the stock, he is entitled to damages but not rescission. *Mott v. Tri-Continental Financial Corp.,* 330 F.2d 468 (2d Cir. 1964). It is undisputed that Wigand owned the 25,000 shares of Flo-Tek at the time he commenced suit. The only evidence that he no longer owned the shares at the time Judge Owen computed damages was the vote of July 11, 1974, of the Flo-Tek Board of Directors, purporting to cancel Wigand's 25,000 shares. If this action, whatever its validity under New Jersey law, had been taken prior to the commencement of suit, the court would have faced a real question whether or not Wigand remained an owner of the stock for purposes of 12(2) relief, or was perhaps given an election between rescission and damages by virtue of the defendant's action. But, as explained above, in order to satisfy the statute's tender requirement a constructive tender by plaintiffs at the time of the complaint must be considered to have occurred. The proper time to make the choice between the two types of relief afforded by section 12(2) is at the time the complaint is filed. *Pfeffer v. Cressaty,* 223 F.Supp. 756 (S.D.N.Y.1963). Any other result would have the unacceptable consequence of allowing a defendant, by the expedient of "cancelling" a plaintiff's shares, to decide, after suit has been commenced, whether or not a successful plaintiff will receive rescission or damages.

At the time Wigand filed his complaint, he owned the stock and the only relief available to him under section 12(2) was

---

physical tender could not be made because the securities were required to be filed in a Registry of Deeds Office. In *Stadia,* plaintiffs made an explicit offer of tender in their amended complaint and deposited the certificates with the clerk of the court. *Chapman* simply speaks of tender in the complaint without elaboration.

rescission. Judge Owen thus erred when he calculated damages using as a measure of plaintiff's loss "the difference between what he paid, or the contract price, and the real or actual value of what he received."

■ Wigand is entitled only to a return of the value of the consideration paid for the 25,000 shares of Flo-Tek stock, plus interest.[8] The value of the stock itself is irrelevant insofar as relief under section 12(2) is concerned. If the consideration passing from plaintiff to defendant is money, the amount to be awarded is simple to calculate. If the consideration is not money but property that is intact at the time of judgment, then the court can also avoid valuation problems by ordering return of the consideration per se. But where, as here, the consideration plaintiff gave defendant in exchange for the stock was uncertain in value at the time of the transaction and not intact at the time of judgment, the court must set a value upon it.

Judge Owen, in the course of calculating the difference between what Wigand gave and what Wigand received, set a value of $125,000 on the consideration paid by Wigand. Judge Owen apparently selected this figure because Wigand received in exchange stock worth approximately $125,000 on the over-the-counter market at the time. It is, however, axiomatic that the value of consideration given by one party cannot be judged by equating it with the value of counter-consideration given by the other party. This is especially true where, as here, the evidence even as to the value of the stock received by Wigand was not of the highest order of reliability—the "market price" of a thinly traded over-the-counter stock, more than 75% of which was held by the defendant and his family.

Judge Owen also relied on a provision of the New York Business Corporation Law, section 504(a) (McKinneys 1963), which provides that "[i]n the absence of fraud in the transaction, the judgment of the board or shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive." Typically, this section is used to deal with the problem of directors who issue stock for less valuable consideration than is fair to existing stockholders. *See, e. g., Flour City National Bank v. Shire*, 88 App.Div. 401, 84 N.Y.S. 810, *aff'd*, 179 N.Y. 587, 72 N.E. 1141 (1903). It was not meant to supply a formula for damages in federal securities cases. Finally and most important, section 504(a) explicitly exempts suits charging fraud—as a suit under section 12(2) of the 1933 Act in essence does.

■ Consequently, we must remand this case to the district court to value the consideration Wigand gave Kiernan, and to hold such further evidentiary hearings as may be necessary. A threshold question to be resolved is the nature of this consideration. In his findings of fact on damages, Judge Owen wrote that "Wigand transferred all of his stock interest in Taconic to Flo-Tek." This finding is not supported by evidence in the record. It is clear that Kiernan and Wigand expected that Wigand's five and a half shares of Taconic would be transferred to Flo-Tek, but there is no evidence such a transfer occurred. The shares were never delivered.

In his findings of fact on liability delivered from the bench on March 29, 1978, Judge Owen said "I find as a factual matter that there was a full transfer of the assets [of Mid-Hudson] . . . there was a de facto transfer." We believe this is the better view of the essence of the transaction

---

**8.** The statute provides that a plaintiff is entitled to recover "the consideration paid for such security with interest thereon, less the amount of any income received thereon." 15 U.S.C. 77*l*. This clause is clearly intended to insure that the plaintiff in a section 12(2) rescission case returns the dividends he has received on the stock he is tendering to his vendor. In this case it is uncontroverted that Flo-Tek has nev-

er paid a dividend to its shareholders at any time. Wigand's income from Flo-Tek during the period he held Flo-Tek shares came to him as an employee and not as a shareholder. Therefore it will not be necessary for the district court, in setting damages, to reduce its award to Wigand as a result of the "income received" clause of section 12(2).

between Wigand and Kiernan. The record shows that Kiernan moved Flo-Tek to Mid-Hudson's premises and assumed working control of the company even before the October 1, 1971 agreement was signed. Although Kiernan now contends that the transfer of assets was illegal under state law and contrary to the restrictions on the stock itself, the record shows that Kiernan acted as if he controlled Mid-Hudson and announced his control to the world. He cannot now be heard to argue that his acts were without legal consequence.

It is indeed unclear upon the record, as Kiernan argues, whether or not Wigand ever possessed de jure control of Mid-Hudson through Taconic. The status of shares held by Montaldo, Powell and Green is uncertain and thus it cannot be said that Wigand's five and a half shares represented a majority interest. Even if they did, they were subject to an agreement between Wigand and Noviello dating from 1970 under which Wigand was not allowed to sell his shares without first offering them to the corporation. Wigand testified that he never made such an offer. It is clear from the record that neither Kiernan nor Wigand acted with any clear appreciation of the legal validity of their actions. However, the legal validity of their actions under state corporate law is not an element of this section 12(2) action under the federal securities laws.

Wigand received stock, and in exchange he gave Kiernan effective control of mid-Hudson's assets, including its plant, work force, bank accounts, and credit. Kiernan may have bargained for legal control of the company, but what he received was de facto control, with which he appeared satisfied. And it is precisely what Kiernan received from Wigand that a court fashioning relief in the nature of rescission must consider.[9]

To determine what the value of de facto control of Mid-Hudson was, as of October, 1971, the district court may require testimony as to Mid-Hudson's assets, profitability, capital structure and business prospects, beyond what appears on the record. Judge Owen's finding that "obviously Mid-Hudson as a going concern itself had value" must be substantiated. The only information in the record as to the value of de facto control of Mid-Hudson is an unaudited financial statement for the six months ending June 31, 1971 (Plaintiff's Exhibit 22), included in Flo-Tek's Report to Shareholders; and an unaudited set of financial statements for the calendar year 1970 attached to the October, 1971 agreement signed by Kiernan and Wigand.

■ One final point must be noted. In awarding Wigand the value of Mid-Hudson's assets as of October 1, 1971 the court must act to protect those individuals entitled to a minority interest in such assets by virtue of their ownership of shares in Taconic. Wigand's five and one half shares gave him only partial rights to these assets. Thus the judgment in favor of Wigand to

---

9. Defendants argue that if the consideration paid by Wigand was indeed control of Mid-Hudson and its assets, then Wigand's action was invalid as a disposition of the corporation's assets without consent of the required two-thirds majority of stockholders. New York Business Corporation Law, section 909(a)(3). But Wigand's conduct in this regard injured the other shareholders of Taconic and not Flo-Tek. The proper forum for an action based on Wigand's conduct would be a suit in state court. And assuming arguendo the illegality of Wigand's conduct, it does not follow that a defense of *in pari delicto* would succeed. Here defendant's wrongdoing was not in itself a violation of any federal securities law. Moreover, the policies of the federal securities laws militate against any but the most restricted application of the *in pari delicto* doctrine. *Katz v.*

*Amos Treat & Co.*, 411 F.2d 1046, 1054 (2d Cir. 1969), suggests that for *in pari delicto* to apply to violations of section 12 of the 1933 Act the plaintiff must have "made himself a part of the basic violation." Here the "basic violation" by Kiernan was unconnected to Wigand's alleged violations of New York law. It is as if a defendant in a suit under Rule 10b–5 were to argue that plaintiff was not entitled to damages because he (the plaintiff) paid for the stock with stolen funds. If it were apparent on this record that Wigand's actions were invalid under state law, then in any case the proper course for this court would be to provide for all or part of his recovery to be held in trust for all the shareholders of Taconic rather than deny any recovery under the securities laws. *Katz v. Amos Treat & Co., supra*, at 1054.

be entered by the district court must contain provision for Wigand to hold part of what he receives from defendants in trust for the other shareholders of Taconic.

Affirmed in part, reversed and remanded in part.

### ORDER AMENDING OPINION

Following the filing of our opinion in this case on October 19, 1979, and the issuance of the mandate on November 11, 1979, our attention was called to this circuit's decision in *Kirshner v. United States of America,* No. 77–6104, 603 F.2d 234, reported in an advance sheet dated October 15, 1979. In *Kirshner,* the majority held that section 17(a) of the Securities Act afforded a private right of action. In light of *Kirshner,* which had been filed November 30, 1978, and thus was the law of the circuit when the case at bar was before us, we have reconsidered our disposition of the plaintiffs' claim under section 17(a). Once again, however, we conclude that this claim presents an issue that we need not reach.

The one circuit that has reached the question has held that private actions under section 17(a) require proof of scienter, *Sanders v. John Nuveen & Co.,* 554 F.2d 790 (7th Cir. 1977). *C. Edward J. Mawod & Co. v. S.E.C.,* 591 F.2d 588 (10th Cir. 1979); *S.E.C. v. Coven,* 581 F.2d 1020 (2d Cir. 1978); *S.E.C. v. Americal Realty Trust,* 586 F.2d 1001 (4th Cir. 1978). *Sanders,* however, took no position on whether the scienter required could be shown by negligent behavior. The plaintiffs below made allegations which only under the most liberal interpretation can be said to include allegations of scienter, and there was no attempt at trial to prove this element of the cause of action. In light of the undesirability of resolving the difficult issues referred to above in a case in which they were unbriefed, we adhere to our disposition of the case by affirming Judge Owen's judgment of liability on section 12(2) grounds alone. Finally, we note that there is little reason to remand to Judge Owen for the purpose of asking him to determine whether the case should be reopened on the scienter issues, since the plaintiffs' recovery under section 17(a) would in all likelihood not differ from the recovery we have ordered here—an award to the plaintiff of the value of the consideration he gave to the defendants, which satisfies both the rescissionary damages standard of section 12(2) and the compensatory damages standard of section 17(a).