**In the Matter of GOLDEN GULF, LTD., Debtor.**

**Ronald L. BOYER, trustee in bankruptcy, and New Equity Security Holders Committee, Plaintiff,**

v.

**Robert JOHNSON, Frank Hersey, Robert Hogue, Jim Laubhan, Defendants.**

**Ronald L. BOYER, trustee in bankruptcy, and New Equity Security Holders Committee, Plaintiffs,**

v.

**Kamurapillar NARENDRAN and Jerry C. Phillips, Defendants.**

**Bankruptcy No. LR 82–1160.**
**Adv. Nos. AP 86–0147 to AP 86–0151, and AP 86–0383.**

United States Bankruptcy Court, E.D. Arkansas, W.D.

Jan. 30, 1987.

Ronald L. Boyer, Rogers, Ark., for plaintiff.

Stephen Bilheimer, Bell, Bilheimer & Associates, Little Rock, Ark., for defendants.

REPORT AND RECOMMENDATION OF THE BANKRUPTCY COURT TO THE DISTRICT COURT THAT REFERENCE TO THE BANKRUPTCY COURT OF THE ABOVE STYLED ADVERSARY PROCEEDINGS BE MANDATORILY WITHDRAWN UNDER THE PROVISIONS OF § 157(d), TITLE 28, UNITED STATES CODE, OR THAT THE BANKRUPTCY COURT ALTERNATIVELY BE GIVEN SPECIAL INSTRUCTIONS RESPECTING TRIAL AND DISPOSITION OF ACTIONS OR THAT BANKRUPTCY JUDGE BE DESIGNATED AS A JUDICIAL OFFICER OF THE DISTRICT COURT TO HEAR AND DETERMINE ACTIONS

DENNIS J. STEWART, Chief Judge.

## Introduction and Preamble

The above adversary proceedings have all been submitted to the bankruptcy court in the year 1986 on the motions of the various defendants for mandatory withdrawal of reference pursuant to § 157(d), Title 28, United States Code, on the grounds that the resolution of the actions "requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Because the motions were filed at intervals throughout the year 1986, rather than determine them piecemeal, which would have violated the fundamental tenets of judicial efficiency, the court awaited a statement by the trustee in bankruptcy as to whether he desired the bankruptcy court to recommend referral to the district court or whether he desired to prosecute the actions in as state court of competent jurisdiction. On December 15, 1986, in Little Rock, Arkansas, the plaintiff trustee in bankruptcy indicated that it was his preference that the actions be referred to district court. Because the choice of forum, at least initially, is the plaintiffs', the court will endeavor to refer these actions in such a manner that jurisdiction continues to be well founded and, at the same time, no appreciable consumption of the district court's time may be required.

## Procedure

■ The provisions of § 157(d), *supra*, do not specify any particular manner for the filing and determination of motions or applications for mandatory withdrawal of reference. Some authority argues that such motions or applications should be filed in the district court.[1] Such a motion was filed with the district court on one of these actions, and it was, in substance, delegated to the bankruptcy court for a preliminary determination of whether the action was of a nature which would require mandatory withdrawal.[2] This court has therefore determined that it should proceed by way of making a report and recommendation to the district court on the mandatory withdrawal issue as provided in § 157(c)(1), Title 28, United States Code.

## The procedural history of adversary actions numbered 86–0147, 86–0149, 86–0150, and 86–0151

These are actions brought by the trustee in bankruptcy for the purpose of recovering on "investor notes" from the respective defendants, all of whom are alleged to have issued notes in favor of the debtor corporation which have not been paid.[3] The bankruptcy court previously issued it orders setting those actions for trial on July 8,

1. See, e.g., Greenfield, The National Bankruptcy Conference's Position on the Court System under the Bankruptcy Amendments and Federal Judgeship Act of 1984, and Suggestions for Rules Promulgation, 23 Harvard Journal on Legislation 357, 370 (1986), to the following effect: "It is the Conference's position that a motion for withdrawal of a case or proceeding should be filed in the first instance before the district court." See also the case decisions cited in note 43 thereof.

2. It was the district court's directive that the bankruptcy court should determine whether the actions before it were "core" proceedings within the meaning of section 157(b), Title 28, United States Code. For the reasons stated in the text of this memorandum, the bankruptcy court has concluded that the actions are not "core" proceedings.

3. In the *Phillips* case, for instance, no. AP86–383, the plaintiffs allege that the "investor note" was executed "(a)s part of the method of payment of the limited partnership units."

1986. But shortly before the initially-scheduled trial of each action, the defendants each filed counterclaims seeking damages based upon allegations of fraud and misrepresentation and misleading statements and omissions in the offering circular which pertained to the purchases of securities (representing "limited partnership units") which was the subject matter of each complaint. Each defendant then requested a jury trial on the basis of the counterclaim and also requested that the bankruptcy court surrender jurisdiction of each of the actions as now involving questions of nonbankruptcy law, which, under the rule of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), cannot be determined by a non-Article-III bankruptcy court.[4]

It was the initial decision of the bankruptcy court, however, not to permit the defendants to assert a counterclaim or setoff in the bankruptcy court if it would defeat bankruptcy court jurisdiction and thereby delay trial and determination of the action brought by the trustee.[5] This was fully within the power of the bankruptcy court, for it is uniformly recognized that the issue of whether setoff may be exercised against the bankruptcy estate is wholly within the sound discretion of the bankruptcy court.[6] Thus, without engaging any claim which might arise exclusively under state law within the meaning of *Northern Pipeline Constr. Co., supra*, it appeared that the bankruptcy court might lawfully hear and determine the trustee's cause of action. The setoff or counterclaim might be treated as ordinary claims against the estate.[7]

It is true that the bankruptcy court could not prevent the defendants from raising fraud, misrepresentation and violation of the securities laws of the United States as affirmative defenses standing in the way of the trustee's asserted right of recovery. But the raising of such defenses does not, of itself, give rise to the right to a jury trial.[8] It is true that the raising of violations of the securities laws of the United States brought into potential focus the provisions of § 157(d), Title 28, United States Code, which requires mandatory withdrawal by the district court from bankruptcy court jurisdiction of any action which involves laws of the United States regulating activities or organizations in interstate commerce as well as title 11 laws.[9] But,

---

**4.** But see *Kalaris v. Donovan*, 697 F.2d 376, 386 (D.C.Cir.1983) ("But the Court has never indicated that all *federally* created private rights must be adjudicated in Article III courts. *Northern Pipeline* effectively held that certain private *state* law claims, when adjudicated within the federal system, must be decided by Article III courts.") (Emphasis in original.)

**5.** Insofar as the counterclaims and claims of setoff are directed toward the debtor, rather than any third parties, it seems patent that adjudication of them—except for the mandatory withdrawal provision of section 157(d)—would have been within the "core" jurisdiction of the bankruptcy court, for they have cognizability only as claims against the bankruptcy estate or as nondischargeability claims. Further, under the express provisions of *Katchen v. Landy*, 382 U.S. 323, 337, 86 S.Ct. 467, 476–77, 15 L.Ed.2d 391 (1966), the demand for a jury trial could be regarded as at least doubtful. ("(A)lthough petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee ..., when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity.") But, in some of the actions, the defendants seek to join third-party defendants on claims which allegedly involve the same issues of law and fact. In such instances, when the action is actually between strangers to the bankruptcy court, i.e., neither the trustee nor the debtor is a party, the courts have traditionally questioned the subject matter jurisdiction of the bankruptcy court.

**6.** "Despite the seemingly mandatory language of section 68a, it has been stated frequently that the privilege of set-off under section 68a is permissive, not mandatory; and that its application, when invoked before a court, rests in the discretion of that court, which exercised such discretion under the general principles of equity." 4 Collier on Bankruptcy para. 68.02, pp. 851–852 (1978).

**7.** See note 5, *supra*.

**8.** See note 5, *supra*.

**9.** "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. *The district court shall, on timely motion of a party,*

according to decisions which were then controlling, in order for this mandatory withdrawal section to apply, the nonbankruptcy statutes involved must be decisive, or give rise to a material issue of fact—"mere involvement" was not sufficient.[10] And it was possible according to the content of the pleadings then before the court that no material issue of fact might be evidenced—that the evidence at trial would show unequivocally either that the allegations of violations of securities laws were without merit as a matter of law or that they were meritorious as a matter of law and would accordingly require summary dismissal.

Therefore, the bankruptcy court, despite the protests of counsel for the several defendants, set these actions for trial on August 14, 1986, in Little Rock, Arkansas, and intended to determine their respective merits at that time.

### The intervening events

Two events intervened, however, before the court could proceed to trial on August 14, 1986. First, an opinion of a higher federal court was published which holds that "a substantial and material question" under federal laws regulating activities or organizations in interstate commerce is sufficient to require mandatory withdrawal.[11] Then, the defendants sought, by means of a motion filed in the district court to require withdrawal of all these actions from the bankruptcy court on the grounds that the scheduled trial in the bankruptcy court would deny them their constitutional right to a jury trial. On the morning of August 14, 1986, before the scheduled time for

trial, the district court issued its written order denying the defendants' motions for mandatory withdrawal, basically on the ground that it was premature, and directing this court preliminarily to decide the issues necessarily raised by the motion for mandatory withdrawal. Those issues will be discussed in the paragraphs which follow.

### The current status of the law appears to require mandatory withdrawal

As observed above, the type of trial which was being contemplated by the bankruptcy court did not in any way figure to deny the defendants any right to a jury trial.[12] But the considerations made necessary by the district court's order of August 14, 1982, go beyond that observation and require that the bankruptcy court give its paramount attention to the issue of mandatory withdrawal under § 157(d), *supra.* This is so because the district court has explicitly stated in its order of August 14, 1986, that any subsequent motion for withdrawal of reference by any of the defendants will be considered timely. Further, because the type of withdrawal described in the second sentence of § 157(d), *supra,* is described as "mandatory", the issue may well be considered by the court to be jurisdictional. If so, it may be raised at any time during the proceedings and even for the first time on appeal. And, if jurisdiction is found by an appellate court to be lacking, any judgment rendered by the bankruptcy court will have been a useless and futile effort—one which it may be ad-

---

*so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."* Section 157(d), Title 28, United States Code. (Emphasis added.)

10. See, e.g., *In re White Motor Corp.,* 42 B.R. 693, 703 (N.D.Ohio 1984) ("Section 157(d) must . . . be read to require withdrawal not simply whenever non-Code federal statutes will be *considered* but rather only when such consideration is necessary for *resolution* of a case or proceeding.") (Emphasis in original.)

11. See *In re Anthony Tammaro, Inc.,* 56 B.R. 999, 1007 (D.N.J.1986). Although some of the language in that decision is arcane and confusing, the final holding appears to be to the effect only that, to invoke section 157(d) successfully, "the moving party must establish that the proceeding involves a substantial and material question of both Title 11 and non-Code federal law and that the non-Code federal law has more than a *de minimis* effect on interstate commerce." This decision was made on January 16, 1986, but did not appear in the advance sheets until March 1986.

12. See note 5, *supra.*

visable to avoid by having that court take jurisdiction which unquestionably has it. Therefore, the bankruptcy court will recommend that the district court mandatorily withdraw these actions from the bankruptcy court.

As a final consideration favoring withdrawal of reference from the bankruptcy court, it should be mentioned that requiring the bankruptcy court to hear and determine these actions might be interpreted as conferring Article III powers on the bankruptcy court and, in so doing, causing an elevation of the bankruptcy court to Article III status. There can be little doubt that the structure of the statutes controlling the jurisdiction of the bankruptcy court is intended to place this type of case beyond the non-consent jurisdiction of the bankruptcy court and distinctly into the category of proceedings which arise under non-bankruptcy law within the meaning of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and its progeny. If the statutes, however, are interpreted to confer the power of hearing and determining [13] the action on the bankruptcy court, it may well mean that the bankruptcy court is ordered to act as an Article III court. Under the historical principles which relate to classification of courts, this may have the tendency to convert the bankruptcy court into an Article III court. In *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), it was held that the determination of whether a court is an Article III court or a non-Article-III court depends upon the type of "judicial business" which is done by a court and that the statutory conferring of any of the federal judicial power upon a subconstitutional court may result in the "maturing" of that court into an Article III court. ":[T]he constitutional quality of tenure and compensation ... must be deemed to have depended upon the constitutional status of the courts to which [these judges] were primarily appointed." *Glidden Co. v. Zdanok*, 370 U.S. 530, 540, 541, 82 S.Ct. 1459, 1467, 1468 (1962). "In accordance with this guiding principle, it has in the past been held that a court initially created as a non-Article III court may 'mature' into an Article III court by reason of being assigned a portion of the federal judicial power." *Matter of Richardson*, 52 B.R. 527, 534 (Bkrtcy.W.D. Mo.1986). "[A]ll of the opinions filed in the Court's latest Article III case, ... agree that it is not what Congress says but what powers Congress vests in the adjudicatory body that counts." *Kalaris v. Donovan*, 697 F.2d 376, 385 (D.C. Cir.1983). The authorities on the issue of court classification continue to state the rule that the conferring of any portion of the federal judicial power upon a court converts it into an Article III court.[14] The bankruptcy courts, under such circumstances, have an interest equal to that of the district court in preventing Article III status from being conferred by accident and without a rational and direct decision by the appropriate branch of Government.[15] Therefore, in respect of the actions now at bar, the bankruptcy court believes that its duty is to recommend that the actions be withdrawn from the bankruptcy court and tried and determined in the district court, either by the district judge or, as further recommended below, by a bankruptcy judge acting as a "judicial officer of the district

13. "(T)he plurality opinion (in *Marathon*) ... approved the initial determination of 'private rights' by non-Article III judges, so long as the 'essential attributes of the judicial power' were reserved in Article III courts ... (I)t is clear that Article III does not require Article III judges to perform *every stage* of adjudication where 'private rights' are at stake." *Kalaris v. Donovan*, 697 F.2d 376, 386 (D.C.Cir.1983).

14. See the authorities cited in *Matter of Transport Clearings-Midwest, Inc.*, 41 B.R. 528, 538, n. 28 (Bkrtcy.W.D.Mo.1984).

15. "Congress and the higher courts ha(ve) to be circumscript in delegating powers to the bankruptcy court lest they by indirection confer Article III powers on the bankruptcy court. Accordingly, the bankruptcy court must be circumscript in interpreting the law delegating powers to it lest it be accused of arrogating

court" within the meaning of section 151, Title 28, United States Code.[16]

### The second alternative

The single imaginable way in which mandatory withdrawal of reference may conceivably be avoided is for the bankruptcy court, in effect, to grant summary judgment for the defendants. Historically, under the former Bankruptcy Act, it was held to be within the unquestioned "summary" jurisdiction of the bankruptcy court to issue a judgment for a trustee in bankruptcy on his complaint for turnover when there was no substantial issue of law or fact. ("[An] adverse claim [may] be deemed merely colorable, so as to give the bankruptcy court summary jurisdiction, if its validity [does not] depend ... upon disputed facts as to which there is a conflict of evidence as well as a controversy in matter of law." 2 Collier on Bankruptcy ¶ 23.07 [2], p. 527 (14th ed. 1976).) The contours of the old "summary" jurisdiction of the bankruptcy court are similar to those of contemporary "core" jurisdiction. See, e.g. *Matter of Midwestern Companies, Inc.* 49 B.R. 98, 103 (Bkrtcy.W.D.Mo. 1985). Accordingly, when there have been no issues of law or fact presented, bankruptcy courts have continued to exercise jurisdiction in adversary proceedings which otherwise could not have been considered to be within their "core" jurisdiction. See, e.g. *Matter of Colin,* 44 B.R. 704, 708 (Bkrtcy.W.D.Mo.1984) ("In order to com-

mand a right to attention and determination by a court of plenary jurisdiction, the parties must demonstrate that there is a genuine issue to be resolved by it.") In these actions, the defendants have made uncontradicted factual showings of false and misleading statements and omissions in the offering circular which accompanied the sale of stock subscriptions. These statements include overstating the educational achievements of a key vice president—stating that he was a college graduate when in fact he was not—and omitting to state that the same officer had formerly suffered a federal felony conviction. Further, certain misstatements and omissions concerning the operations of the debtor corporation were demonstrated by uncontradicted reference to the findings of another bankruptcy court in a prior action relating to the same offering circular.[17] Under governing legal authority, this would appear to be a sufficient defense to the trustee's claim for relief. See 69 Am. Jur.2d *Securities Regulation-Federal* § 552, p. 1042 (1973), to the following effect:

"The Securities Act provides that where any person offers or sells a security by means of a prospectus or oral communication, which includes an untrue statement of material fact, or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they are made, not

Article III powers to itself." *Matter of Richardson,* 52 B.R. 527, 533 (Bkrtcy.W.D.Mo.1985).

**16.** This is treated as the "third alternative" in the further text of this memorandum. It appears to have the virtue of at once honoring the statute requiring mandatory withdrawal and still permitting trial and determination by a bankruptcy judge. Similarly, it avoids the possibility of offending the rule of *Marathon* decision, because it does not involve the trial and determination of a *state-law* cause of action by a non-Article-III judge "(T)here is nothing in *Marathon* which constitutionally or otherwise requires federal law issues to be decided by an Article III court." *In re Anthony Tammaro, Inc.,* 56 B.R. 999, 1005 (D.N.J.1986).

**17.** In an order of September 27, 1984, in *Matter of the Grand Limited Partnership,* Case No. 82-01319 (Bkrtcy.D.S.C.), the Honorable Rufus W. Reynolds, bankruptcy judge in the District of South Carolina, entered an order subordinating

the claim of the trustee for Kane-related entities, based on findings that, *inter alia,* "William Campbell, vice-president of RPC had a business administration degree from the University of Arkansas. In fact, Mr. Campbell does not have a college degree." Other allegations of false and misleading statements have been made by the plaintiffs in these actions and, in further hearings, those may be proven. But those concerning Mr. Campbell's qualifications have been proven in this court. Facts have also been shown concerning the key position of Mr. Campbell and that he acted in concert with Mr. Kane in manipulating the various organizations. The South Carolina court explicitly found that "Intra-company transfers of funds were common. The transfers were made without formal documentary evidence or corporate authorization to support the transactions. The transfers were authorized by Kane, Campbell or Morton."

misleading, the person purchasing such security from him ordinarily may, if he still holds the security, have such contract of sale rescinded, or if he has disposed of the contract, obtain damages for any injury sustained as the result of such sale. It is not necessary that the purchaser shall have relied upon the truth of the statement concerned in order to be able to avail himself of the provision, but he may not recover if he knew of the untruth or omission at the time he purchased the securities."

See also § 771, Title 15, United States Code, to the effect that:

"Any person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

And see 69 Am.Jur.2d *Securities Regulation-Federal* § 553, pp. 1042, 1043 (1973), to the following effect:

"Any person who makes or causes to be made any statement in any application, report, or document filed pursuant to the Exchange Act, or any rule or regulation thereunder, ... which statement was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, may be liable to any person purchasing or selling a security at a price

which was affected by such statement. Such liability is contingent upon reliance, on the part of the person bringing suit, upon the truth and accuracy of the statement concerned."

See also section 78j, Title 15, United States Code; Rule 10b–5 of the Securities and Exchange Commission. The authorities, however, define "reliance" under these sections so as to compare with considerations of materiality. See, e.g., *List v. Fashion Park, Inc.*, 340 F.2d 457, 463, 22 A.L.R.3d 782 (2d Cir.1965), to the following effect:

"Because there is much disagreement and confusion among the parties concerning the meaning and applicability of 'reliance' and 'materiality' under Rule 10b–5, we think it advisable first to set forth the well known and well understood common law definitions of those terms and the reasons for the rules in which the terms are incorporated. Insofar as is pertinent here, the test of 'reliance' is whether 'the misrepresentations is a substantial factor in determining the course of conduct which results in ... the loss.' ... The basic test of 'materiality,' on the other hand, is whether 'a reasonable man would attach importance (to the fact represented) in determining his choice of action in the transaction in question.' "

See also *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1283 (9th Cir.1982), to the following effect: "A finding of nonreliance implies that plaintiffs would have acted no differently had they known the truth." Nor does it seem that there can be any serious question concerning the materiality of the false or misleading statements which are involved in this action. It would seem that the above-cited misstatements and omissions may, as a matter of law, be material to some investor or other. The governing authorities have generally held, under the federal securities laws, that the misstatement or omission of information respecting the key officers or directors of the organization to which the securities relate constitutes a material misstatement or omission within the meaning of section 77*l* of the Act. Information concerning "the officers and directors of the issuer" is

ordinarily required in registration statements and offering circulars. *Western Federal Corp. v. Erickson*, 739 F.2d 1439, 1443 (9th Cir.1984). The characteristics of the "target company's" board of directors was held to be a potential material omission in *Spielman v. General Host Corp.*, 538 F.2d 39 (2d Cir.1976). When it was represented that "personnel" were "sufficient" to support the company's programs, it was deemed a material representation in *Plunkett v. Francisco*, 430 F.Supp. 235, 241 (N.D.Ga.1977). Under the standard of materiality set out in *List v. Fashion Park, supra*, it seems likely that, had the defendants known that Mr. Campbell was not a college graduate, as represented in the offering circular, and in fact that he had suffered a felony conviction, for which he served time in prison, they would have been influenced to act differently in respect of purchasing or not purchasing the securities which form the basis for the trustee's within claim. Under the provisions of section 77*l*, *supra*, the defendants would be entitled to recover "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if [they] no longer own ... the security." This right to damages, without more, would recoup any sum which the plaintiff might recover as the subscription price of the security.[18] And recoupment is all that the bankruptcy court has, from the inception of these actions, purported to undertake to adjudge.[19] The bankruptcy court did not conceive of itself at the outset as having jurisdiction of the third-party claims.[20] Independently, it seems, the defendants would have, if the misrepresentation and omission adverted to above are deemed material, the right to rescind the contracts on which these suits are brought.[21]

It is true that the misrepresentation respecting William Campbell's educational attainments and the omission concerning his criminal conviction were offered in evidence only in the hearing which was held pursuant to the abovementioned district court order in some of these actions. But the same offering circular would be the subject of the defenses raised in all of the above-styled actions. If it contains misrepresentations or omissions, or both, which are material, then that determinative fact would be applicable in all these actions under the doctrine of collateral estoppel. "[I]n most American jurisdictions, including the federal, strangers to the prior action are permitted to plead a collateral estoppel unless it appears that the party against whom it is pleaded did not have a full and fair opportunity to litigate the issue or the court finds that it is otherwise unfair to permit the use of estoppel." 1B Moore's Federal Practice ¶ 0.441(2), p. 725 (1984).

Finally, the bankruptcy court must state, in presenting this alternative to the district court, that it presents this alternative as a possibility, based on the foregoing recommended findings and conclusions. The bankruptcy court itself has refrained from developing any final and conclusive opinion on this potential summary judgment. It is simply intended to leave it open to the district court to consider this alternative together with the other two on the basis of the recommended findings of fact and conclusions of law which are now made by the bankruptcy court in accordance with § 157(c)(1), Title 28, United States Code.

Thus, it may be the case *sub judice* that there is no genuine issue of law or fact and that the defendants are entitled to judgment as a matter of law. If the district court determines that the bankruptcy court should consider this possibility, it is within its power to remand the action to the bankruptcy court with instructions to do so.[22] But, because at least one line of authority relating to mandatory withdrawal may not

---

18. It seems patent that the interests in Kane-related entities could currently have no value.

19. See note 5, *supra.*

20. See note 5, *supra.*

21. See, e.g., *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir.1979).

22. See Section 157(c)(1), Title 28, United States Code.

permit this latitude, the bankruptcy court cannot itself make this choice.[23]

### The third alternative

The bankruptcy court, caught in this case between two undesirable alternatives—one of exercising its own doubtful jurisdiction in a manner which may cause its work to have been wholly futile and the other of adding a considerable quantum of judicial work to a district court docket which is already loaded with cases of greater importance than bankruptcy cases—has devoted a considerable period of time to studying a third alternative. It appears from the letter of the statutory scheme which defines the limits of bankruptcy court jurisdiction and from the decisional authority relevantly interpreting the *Marathon* decision, *supra*, that, even after mandatory withdrawal of reference from the bankruptcy court under § 157(d), *supra*, and even if the case involves material issues of fact, or both, the district court may, in its discretion, refer the action to a bankruptcy judge who, as a judicial officer of the district court, may hear and determine the action or, as the district court may elect, may hear the case subject to the district court's determining it. Section 151, Title 28, United States Code, which defines bankruptcy court jurisdiction, according to its letter, leaves it open for a district court to grant bankruptcy judges jurisdiction to act within the parameters of its considerable limitations. That section provides as follows:

"In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, *as a judicial officer of the district court,*

*may exercise the authority conferred in this chapter* with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, *except as otherwise provided by law or by rule or order of the district court.*" (Emphasis added.)

The standard canons of statutory construction teach that the phrase last emphasized above containing the modifying language pertains to both of the prior clauses of the compound sentence.[24] And the recent history of bankruptcy court jurisdiction further demonstrates that the district court may lawfully, by rule or order, confer its powers upon bankruptcy judges. The interim rule for bankruptcy court administration was approved as constitutional by each and every appellate court which considered a constitutional challenge to it, even though it did not have an express statutory authorization behind it such as is contained in § 151, *supra*.[25] Utilization of the power thus conferred upon the district court to confer jurisdiction upon a bankruptcy judge to hear and determine an action arising under a federal statute—such as the federal securities statutes, in the case at bar—would not violate the rule of the *Marathon* case, *supra*. The federal appellate courts have unanimously held that that rule does not constitutionally proscribe a bankruptcy judge's hearing and determining a cause of action which was created under the federal, as opposed to state, laws. "[T]he Court has never indicated that all *federally* created private rights must be adjudicated in Article III courts. *Northern Pipeline* effectively held that certain private *state* law claims, when adjudicated within the federal system, must be decided by Article III courts." *Kalaris v. Donovan*, 697 F.2d 376, 386 (D.C.Cir.1983); "[T]here is nothing in *Marathon* which con-

---

**23.** See note 11, *supra*.

**24.** "The presence of a comma separating a modifying clause in a statute from the clause immediately preceding, is an indication that the modifying clause was intended to modify all the preceding clauses, and not only the last antecedent one." 73 Am.Jur.2d *Statutes* section 231, p. 415 (1974).

**25.** Although section 1471, Title 28, United States Code, then continued to grant jurisdiction in the

district court, there was no express provision which permitted the district court to create or expand bankruptcy court jurisdiction by rule. Yet, the authorities approved it. It would therefore seem that the argument to expand the bankruptcy court responsibility in this case is much stronger, since it has the express authorization contained in section 151, Title 28, United States Code.

stitutionally or otherwise requires federal law issues to be decided by an Article III court." *In re Anthony Tammaro, Inc.*, 56 B.R. 999, 1005 (D.N.J.1986); cf. *In re Price-Watson Co.*, 66 B.R. 144 (Bkrtcy.S.D. Tex.1986). These authorities find a substantial basis for this conclusion in the *Marathon* case itself, *supra*, 102 S.Ct. at 2877, to the following effect:

> "[W]hen Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before a particularized tribunal created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, effect the exercise of judicial power, but they are also incidental to Congress' power to define the right which it has created."

The issues at bar are Congressionally created and are expressly provided to be tried in a court of law or equity.[26] It is altogether possible that Congress, in enacting § 151, *supra*, intended for the district courts to expand the bankruptcy judge's duties in just such a manner as is recommended in these actions. As observed above, this is true, not only from the application of the standard and mechanical canons of construction to § 151, but also from the recent jurisprudential developments in bankruptcy judges' responsibilities, which has tended to emphasize the power of a district court to expand those responsibilities when it would be beneficial to the administration of justice to do so.[26] If bankruptcy judges, as inferior officers of the district court, have the power to insist that they be assigned only certain types of cases, it would seem that they in reality have an independence and freedom from supervision that was not intended by the general letter of the Bankruptcy Amendments and Federal Judgeship Act of 1984.

It is therefore, accordingly,

**26.** "Any court of competent jurisdiction" is the phrase utilized in the jurisdictional statute. See

RECOMMENDED that the district court, pursuant to section 157(d), Title 28, United States Code, either (1) mandatorily withdraw these actions from the bankruptcy court for trial and determination in the district court or (2) remand the actions to the bankruptcy court for the entry of summary judgment in consonance with the foregoing considerations or (3) mandatorily withdraw the actions and refer them to the bankruptcy judge for trial and determination in accordance with § 151, Title 28, United States Code. Copies of the above and foregoing report and recommendation have been served on counsel of record by mailing on the date below mentioned and they shall have 15 days from and after that date in which to file written exceptions to any recommended finding of fact or conclusion of law.

page 10 of the text of this memorandum, *supra*.