**In the Matter of Lyle Dewayne RICHARDSON and Nellie Jane Richardson, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Lyle Dewayne RICHARDSON and Nellie Jane Richardson, Defendants.**

**Bankruptcy No. 84–01253–SJ–W–7. Adv. No. 85–0453–SJ–W.**

United States Bankruptcy Court
W.D. Missouri,
St. Joseph Division.

April 5, 1988.

David DeTar Newbert, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

David Tushaus, Legal Aid of Western Missouri, St. Joseph, Mo., for defendants.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING JUDGMENT REFORMING AND VACATING FORMER JUDGMENT DENYING DEFENDANTS' DISCHARGES AND INSTEAD GRANTING DEFENDANTS' DISCHARGES IN BANKRUPTCY

DENNIS J. STEWART, Chief Judge.

This court formerly entered its final judgment on October 24, 1986, denying the defendants' discharges in bankruptcy. The court held that the defendants had intentionally disobeyed its former orders[1]

---

[1] In critical respect, with respect to the defendants' refusal to obey the outstanding orders of this court directing them to turn over certain proceeds of sale of livestock to the plaintiff, this court found as follows:

"The debtors also raised the defense—but solely by means of the conclusionary statements of counsel—that they currently had no funds with which to comply with the court's prior orders directing that the property or its proceeds be turned over to the plaintiff. But no real evidence supporting this contention was adduced. Rather, proof of the existence of this defense was left ... to the conclusionary statements of counsel. Finally—at least by strong implication—the debtors raised the defense of advice of counsel, pleading that they only heeded the advice of their counsel

in refusing to obey the reclamation orders of the bankruptcy court.

\* \* \* \* \*

"If it were sufficiently shown that the debtors were, at all relevant times subsequent to the order, unable to comply with the turnover order, such might suffice as a full and adequate defense. But there is no cognizable proof, for one thing, that the debtors have at any time lacked financial ability to pay the value of the chattels. As stated above, the debtors offered no evidence on this issue. Rather, they relied only on the wholly conclusionary statements of counsel. Further, at least at the outset, before the chattels were sold, the defendants clearly had the ability to grant reclamation to plaintiff. The fact that they did not do so, but instead sold the property and continued—in the face of the existing

to pay the plaintiff the sum of $3,842 according to their ability to do so. The orders of the bankruptcy court thus entered were, in form and substance, turnover orders, contemplating that the debtors, in effect, restore estate property to a creditor who had the right to possess it.[2] As such, the orders were enforceable by means of civil contempt processes to the extent of the defendants' ability to comply with them. "Failure to comply with a turnover order constitutes a civil contempt of court, for which the person disobeying may be subject to fine or imprisonment. The turnover order itself conclusively establishes the jurisdiction of the court, whether judge or referee, and the defendant's then ability to comply with the order. These matters may not be collaterally attacked in the contempt proceeding." 2 Collier on Bankruptcy para. 23.10(4), pp. 586.1, 586.2 (14th ed. 1976). In the contempt proceeding, or other enforcement proceeding, "the only issue before the court is the alleged contemner's present ability to comply." *Id.* at 586.2. And, because the turnover order itself is, as mentioned above, conclusive on the then-existing ability of the debtor to comply, the

burden is on the debtor in the contempt proceedings to demonstrate his or her inability to comply.[3] See *Maggio v. Zeitz*, 333 U.S. 56, 75–76, 68 S.Ct. 401, 411–12, 92 L.Ed. 476 (1948), to the following relevant effect:

> "(I)n these civil contempt cases ... the bankrupt, confronted by the order establishing prior possession at a time when continuance thereof is the reasonable inference, is thereby confronted by a prima facie case which he can successfully meet only with a showing of present inability to comply. He cannot challenge the previous adjudication of possession, but that does not prevent him from establishing lack of present possession. Of course, if he offers no evidence as to his inability to comply with the turnover order, or stands mute, he does not meet the issue. Nor does he do so by evidence or by his own denials which the court finds incredible in context."

Consequently, in the course of attempting to enforce its orders directing the debtors to turn over to plaintiff the sum of $3,842, the court observed that it was the duty of

---

reclamation order—to utilize the proceeds for their own benefit in itself shows a contumacious violation of the court's orders.

"Nor can it be said, under the circumstances of this action, that advice of counsel can be an availing defense. The law is well established to the effect that advice of counsel does not serve to excuse debtors from penalties for noncompliance with court orders when it is obvious that those orders were not only clearly made and in writing, they were not appealed and they were clarified and repeated. Neither the debtors nor their counsel were privileged to question the court's orders in retrospect after they had permitted the time for directly appealing them to run out without challenging the orders."

*Matter of Richardson*, 67 B.R. 624, 628, 629 (Bkrtcy.W.D.Mo.1986).

2. Under the provisions of section 541 of the Bankruptcy Code, all property of the debtor, even if it is encumbered, is deemed to be property of the bankruptcy estate as of the time of the filing of the petition. "One of the more frequent forms of the exercise of summary jurisdiction is the issuance of an order to turn over property or its proceeds to the supervision and control of the bankruptcy court and its officers. This is commonly called a 'turnover' order. Such an order may apply to any kind of proper-

ty of the bankrupt estate." 2 Collier on Bankruptcy para. 23.10(1), pp. 560, 561 (14th ed. 1976). Relief may be granted in favor of a creditor in turnover proceedings if, as in the case at bar, that creditor would have a claim against the property in the estate when it was turned over. *Application of Holbrook*, 42 F.Supp. 814 (E.D.N.Y.1942). Sometimes, a creditor's suit for property in the hands of a debtor is referred to as a "reclamation" petition, which is regarded in all procedural respects the equivalent of a turnover order, except that it is brought against the trustee or the debtor. See 2 Collier on Bankruptcy para. 23.11, p. 588 (14th ed. 1976) ("The converse of turnover orders directed against the bankrupt or others is the petition of a claimant not in possession who invokes the jurisdiction of the bankruptcy court in order to assert his claim or title and regain possession from the trustee (or the debtor)." See *In re Pizzolato*, 268 F.Supp. 353 (W.D.Ark. 1967) (Reclamation petition against a debtor).

3. "The defendant's sworn denial of ability to comply is not conclusive, though it may be given due consideration; and the court, as in the original turnover proceeding, may reject improbable explanations. Mere silence, however, does not meet the issue raised by the receiver's or trustee's prima facie case." 2 Collier on Bankruptcy para. 23.10, p. 586.5 (14th ed. 1976).

the debtors, under the bankruptcy laws, to comply with the turnover order to the extent of their ability to do so.[4] The court thereby gave the defendants fair notice that, in any proceeding to enforce the order directing the turnover of the $3,842 to the plaintiff they would be required to demonstrate either that they had complied with the order or else demonstrate that they were unable to do so. This is the rule, not only in respect of the enforcement of turnover orders, but in contempt and other enforcement proceedings generally. See, e.g., *Donovan v. Mazzola*, 716 F.2d 1226, 1240 (9th Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), to the effect that alleged contemners "b(ear) the burden of demonstrating that they were unable to comply" and that "(t)o satisfy this burden the individual appellants were required to show 'categorically and in detail' why they were unable to to comply with the court's previous order." Any other rule would defy reason and common sense. A court cannot be justified in adjudging a person in contempt for failure to accomplish what that person cannot accomplish, but neither is that person justified in believing that he may ignore the court's orders if he has a subjective belief that he is unable to do so and that he only need apprise the court of that subjective belief to avoid the contempt adjudication.

▮ Accordingly, when the plaintiff filed and prosecuted the within objection to discharge, the burden fell on the defendants to demonstrate their inability to comply with the court's orders. This is so because the objection to discharge for refusal to obey a lawful order of court is, in substance, a contempt proceeding. "A debtor will be denied a discharge if he has refused in the case to obey any lawful order of the court ... (Thus), (c)ontempt of court, provided the order ignored was lawful, provides a basis for an objection to discharge." 4 Collier on Bankruptcy para. 727.09(2), p. 727–77 (15th ed. 1987). Further, the rule is well established that when the objecting party demonstrates that the order was not obeyed, the burden of going forward with evidence to the contrary shifts to the debtor. See *Connelly v. Michael*, 424 F.2d 387, 389 (5th Cir.1970), to the following effect:

> "It is axiomatic that the party objecting to a bankrupt's discharge has the burden to establish a reasonable basis for believing that the bankrupt has committed an act which would prevent a discharge in bankruptcy ... When the (objecting party) has met this burden, the burden of going forward with the evidence is upon the bankrupt to demonstrate that the bankrupt has not committed any of the alleged acts ... (or to) offer ... evidence to justify (the bankrupt's) failure to (comply with the law or the court's orders.)"

"The burden of proving that he has not committed an act which will prevent his discharge is upon the bankrupt after the objector has made a prima facie case." *Feldenstein v. Radio Distributing Company*, 323 F.2d 892, 893 (6th Cir.1963). That the debtors understood that it was their duty somehow to justify their refusal to comply with the court's turnover orders was made clear in the hearing on the within objection to discharge, in which they saw fit to attempt to offer evidence justifying noncompliance with the court's prior orders in terms of their ability or inability to comply with them. But, as this court expressly

---

**4.** The district court, in its order of remand, roundly criticizes the bankruptcy court for directing turnover of the $3,842.79 only "according to (the defendants') current ability to pay," stating that "the (bankruptcy) court confused the issue by ordering that the debtors pay according to their ability." *In re Richardson*, 78 B.R. 960, 962 (W.D.Mo.1987). But, according to the law which is set out in the text of this memorandum, as well as that in the court's findings of fact and conclusions of law supporting the initial denial of discharge, the bankruptcy court's order in this respect appears eminent-ly to have been correct. And, if incorrect, why has the district court asked this court to key new findings to that statement of the law on remand? The district court has the unquestioned power to review the bankruptcy court's legal conclusions *de novo* and correct them summarily if they are wrong. But it seems clear that the district court recognized that if—as is necessary in punishing a violation of a court order—it is necessary that the violation be intentional, the order cannot require what is beyond the ability of the party of whom compliance is required.

found in its prior findings of fact and conclusions of law supporting the judgment which is now on remand, the evidence was wholly insufficient to warrant a finding of inability. In fact, as the court previously found, such evidence was, in addition to being impermissibly conclusionary and undetailed, not even admissible in evidence. The offers of evidence which were made by the defendants on the issue of inability to comply are represented by the following excerpts from the transcript:

"QUESTION OF NELLIE JANE RICHARDSON BY HER COUNSEL: Mrs. Richardson, you drove to my office in a Toyota pickup truck. What year is it?

A. '81.

Q. Who owns that pickup truck?

A. It belongs to my son.

Q. Is your son living with you now?

A. Yes.

Q. Is your husband living with you now?

A. No.

Q. Do you know where his whereabouts are?

A. No.

Q. Is he contributing anything to you or your son's welfare?

A. No.

\*    \*    \*    \*    \*    \*

Q. *Do you have any money in the bank?*

A. *No.*

Q. You are aware that I am not charging you a fee for defending you in this process?

A. Yes." (Emphasis supplied.) Tr. 21–22 of the transcript of the hearing of December 18, 1985.

\*    \*    \*    \*    \*    \*

"Q. (by debtors' counsel of Mrs. Richardson) How much farm land did you and Lyle own in your own name (in May 1980)?

A. We did not own any farm land.

Q. Were you pursuing your farming and cattle operations on rented land?

A. That is right." Tr. 24 of the transcript of the hearing of December 18, 1985.

\*    \*    \*    \*    \*    \*

"Q. (by debtors' counsel of Mrs. Richardson) Do you have a bank account presently, Mrs. Richardson?

A. No, I don't.

Q. When is the last time you had had a bank account?

A. Late '83 or early '84.

Q. Is there a reason why you have not or Lyle have not had a bank account?

A. We haven't had any money to put in a bank account.

Q. What property do you presently own in your own name, Mrs. Richardson?

A. I do not own anything in my own name.

Q. *And is it a fact that you are living off of welfare and handouts from your mother?*

A. *Yes.*" (Emphasis supplied.) Tr. 47–48 of the hearing of December 18, 1985.

The court has emphasized the two questions which may have some materiality to the issue of ability or inability to comply with the court's prior orders. They are both leading questions, impermissible under the provisions of Rule 611(c) of the Federal Rules of Evidence, and the answers are accordingly inadmissible in evidence.[5] Further, the leading nature of the first question respecting the absence of a

---

5. This court accordingly characterized the attempt to offer evidence as simply the conclusionary statements of counsel. See note 1, *supra.* For the answers of the defendant Nellie Jane Richardson to the critical questions were simply "yes" or "no." It is true that questions admitting of only "yes" or "no" answers are sometimes not leading. See 3 Weinstein's Evidence para. 611(05), p. 611–78, n. 9 (1987). But the questions in this case, which suggested the answers in detail, were indisputably leading.

"The tenor of the desired reply can be suggested in any number of ways, as, for example, by the form of the question, by emphasis on certain words, by the tone of the questioner or his non-verbal conduct, or by the inclusion of facts still in controversy." *Id.,* p. 611–78. In this case, even if the witness's answers could be deemed admissible—which they cannot be—they would have little probative value. And, as the court found, they are not credible.

bank account or of money in the bank infects the later questions respecting the same matter and, under the governing rules, makes those answers inadmissible as well.[6] Otherwise, in the absence of some relatively substantial and complete accounting for the monies which the debtors had at their disposal at all times subsequent to the issuance of the turnover order, the questions and answers were simply irrelevant.[7] It would make little difference that the debtors had no bank account nor that they owned land nor that their living expenses came from a combination of welfare and "handouts" from relatives if, in fact, from the latter sources, or from any source, monies went through their hands which would have been available to apply to the turnover order. No disavowal in terms of inability, even generally, in fact, was offered, but rather only disparate, general and conclusionary statements that money could not have been available from certain isolated sources. So, even if admissible, the testimony respecting alleged inability to comply was so general and unparticularized that it could not sustain the defense.[8] It was not evidence, if admissible, which was "categorical and in detail" within the meaning of the above authorities.[9] Nor was it credible evidence. And a debtor defending against turnover enforcement orders does not support the defense of inability to comply "by evidence or by his own denials which the court finds incredible in context." *Maggio v. Zeitz, supra*, 333 U.S. at 76, 68 S.Ct. at 411.

This court so found in its final judgment of October 24, 1986, in the following language:

> "The debtors also raised the defense—but solely by means of the conclusionary statements of counsel—that they currently had no funds with which to comply with the court's prior orders directing that the property or its proceeds be turned over to the plaintiff. But no real evidence supporting this contention was adduced. Rather, proof of the existence of this defense was left, as noted above, to the conclusionary statements of counsel."[10]

And, as observed above, the statements of counsel were of such a "conclusionary" character that even if they were required to be attributed to the defendant Nellie Jane Richardson, they could suffice for an excuse for disobedience of the court's order only if it could be said that the court must be satisfied with a debtor's general and unsupported assurance that he had no ability to comply with the subject order.[11]

### The Appeal to District Court

On appeal to the district court, the debtors raised the issue that they could not have intentionally disobeyed the court's turnover order because they read its qualification—to the effect that they were only required to pay according to their ability—to mean that they were free to disregard the orders if they believed that they did not have the ability to pay. The responsive brief of the United States did not point out

---

**6.** "The trial judge is the one to decide whether the questioner may rephrase his question after an objection has been sustained on the ground of leading." 3 Weinstein's Evidence para. 611(05), p. 611–78 (1987). The fact that the plaintiff's counsel failed to object does not relieve the court, in a nonjury trial, from according the evidence only so much probative value as it deserves. And, as the bankruptcy court found, the evidence in this respect was neither complete nor credible.

**7.** None of the questions asked of the defendant Nellie Jane Richardson by her counsel purports to show that, in the period following June 21, 1985, she never had the ability to comply with the court's order. There is no answer which even permits such an inference. And her testi-

mony, if any is admissible, is not credible in these respects.

**8.** "The discretion which the law vests in the court to inquire ... into the ability of the contemner to pay is not fanciful. It is a substantial repository, to be opened by evidence; not sympathy, not phrases, but evidence that will bear scrutiny and have the appearance and ring of truth." *Matter of McMordie*, 33 F.Supp. 739, 741 (N.D.Tex.1940).

**9.** See p. 1011 of this memorandum, *supra.*

**10.** *Matter of Richardson*, 67 B.R. 624, 627 (Bkrtcy.W.D.Mo.1986).

**11.** And cf. note 8, *supra.*

that the defendants had failed in the hearing to offer satisfactory evidence of inability to perform, but rather inadvertently admitted that such evidence had been adduced by Mrs. Richardson.[12] The plaintiff, to support an argument that the defendants may have had an ability to pay, cited evidence of an offer to compromise by the debtors which, furthermore, was adequately explained away by them as an admission that money was available.[13]

### The District Court Order

The district court also disregarded the findings made by this court and instead placed credence in the contention of the defendant Nellie Jane Richardson that she believed that she had no duty to comply with the order. In so doing, it reversed this court's determination that her conclusionary contention to this effect was not credible. Then, it remanded the case to the bankruptcy court for "further findings" as to whether the defendant's belief was reasonable under the circumstances. See *In re Richardson*, 78 B.R. 960, 962 (W.D.Mo. 1987), to the following effect:

> "Appellant Nellie Richardson bases her argument here on the bankruptcy court's June 21, 1985, order requiring payment 'according to the debtor's ability to pay.' Because as she testified at the June 20, 1985, hearing the actual proceeds of the November 1984 sale of 19 calves had been spent for living expenses and as she testified she was *unable* to pay any of the $3,842.79 ordered, she believed that she had no obligation under the bankruptcy court's June 21, 1985, order. Therefore, she argues that a denial of discharge is unwarranted in that she did not disobey a court order. The record contains insufficient findings for me to assess the merits of appellant's argument. In order to address the merits of this appeal, further findings by the bankruptcy court are necessary.

> "Accordingly, it is hereby ORDERED that this case is remanded to the bankruptcy court with directions to make findings of fact as to:

> 1) whether the debtors or either of them reasonably believed that their interpretation of the bankruptcy court's June 21, 1985, order was correct; and

> 2) whether the debtors were in fact insolvent or otherwise unable to repay any portion of the $3,842.79 on or after June 21, 1985."

In thus concluding by implication that the findings already made by the bankruptcy court were insufficient, it may have been the opinion of the district court that the fact that the proceeds of sale of the $3,842.79 had been disposed of provided some evidence either of insolvency or of inability to perform according to the terms of the court's turnover order. But when there is a disposition of the debtor's property subsequent to the date of commencement of the bankruptcy proceeding,[14] that

---

12. Faced with the defendants' contentions on appeal that Nellie Jane Richardson had testified to some extent to her inability to pay, the plaintiff seemed to admit that there was sufficient evidence, if believed, which would support her denial of ability to pay, but only contended that such testimony was not "credible" and that "of course there was *no* testimony offered by Lyle Richardson regarding *his* inability to pay." Plaintiff's appeal brief, p. 13. These statements are only negatives pregnant with the admission that Ms. Richardson had rendered sufficient testimony to escape the duty of compliance, if her testimony were believed. But, as is clearly pointed out in the text of this memorandum, and that which accompanied the initial denial of discharge, *Matter of Richardson*, 67 B.R. 624 (Bkrtcy.W.D.Mo.1986), there was really no competent evidence and it was wholly insufficient to sustain the defendants' recognized burden of establishing inability to pay.

13. Plaintiff on appeal seized upon the defendant's statement that she offered FmHA $3,500 to purchase a tractor. This offer, coming as it did after the issuance of the turnover order, had to constitute in some respect an offer of compromise and settlement which the court cannot consider on the issue in this case of ability or inability to pay. See Rule 408 of the Federal Rules of Evidence. Further, the defendant Nellie Jane Richardson explained the answer by stating without contradiction that the money which would have been available for this purchase would have come from sources other than herself and her husband.

14. "(T)he inability to identify the precise dollars thus received is no obstacle to a turnover order ..." *South Falls Corp. v. Rochelle,* 329 F.2d 611, 612 (5th Cir.1964).

showing can only be made in terms of the debtor's current financial resources.[15] See, e.g., *South Falls Corp. v. Rochelle*, 329 F.2d 611, 619 (5th Cir.1964), holding that when the proceeds of sale of the debtor's property have already been transferred, the debtor (or other person against whom turnover relief would be appropriate):

> "is ... better off dollar for dollar. Had not the Bankrupt's dollar been transferred, (the defendant) would have parted with one of its own. That dollar would have come from its own cash or by liquidation of its ... assets. In effect, it now has a dollar either in cash or property, which it would not have had but for the transfer of bankrupt funds. Of course, where the misappropriation is that of money, equitable concepts analogous to 'tracing' do not require identification of precise dollars as they go through various commercial mutations.... Turnover relief is proper, (*Maggio v. Zeitz, supra,*) held, where '... existing chattels or their proceeds' are available. 333 U.S. 56, 63. Here the 'proceeds' of the cash are the remaining assets saved by this misappropriation of bankrupt funds ... To the full extent of such saving, the remaining assets or their subsequent mutations are available for compulsory turnover. And since (defendant), as one who knowingly misapplied, if not misappropriated bankrupt funds, thereby became an involuntary vicarious fiduciary, the tracing will permeate every asset to the point where this would exhaust the value of all assets as of the date of the turnover order."

So, evidence that the proceeds of sale of the livestock had already been disposed of cannot constitute a sufficient basis for any finding that the debtors were insolvent or that they could have reasonably believed that they were unable to comply with the court's turnover order. And, otherwise, as the court has found in its findings of fact and conclusions of law, it was the debtors who were assigned the burden of producing evidence on this issue and who failed to do so.

### *Effectuating the District Court's Order of Remand*

Thus, from the evidence which has been presented by the parties the court could not make findings of fact which differ from those which have already been made—that there is no evidence which satisfactorily demonstrates the insolvency of the debtors on or after June 21, 1985; that the defendants, in fact, have failed to meet their burden of proof in this regard; and that a ground for denial of discharge consequently exists on the basis of the findings of fact and conclusions of law previously filed by this court.

Further, even if the court could make findings which demonstrated that the debtor Nellie Jane Richardson had testified to such facts which, if believed, would constitute a sufficient showing of insolvency or of absence of intention to disobey the court's turnover order, this court could not be justified in changing its finding that the testimony was not credible, a finding which in large part was based upon the appearance and demeanor of Nellie Jane Richard-

---

**15.** "In the contempt proceeding the only issue before the court is the alleged contemner's present ability to comply." 2 Collier on Bankruptcy para. 23.10, p. 586.2 (14th ed. 1976). With all due respect to the district court, it must also be mentioned that, in denial-of-discharge proceedings, the court can go beyond the current ability of the debtor to comply and deny discharge for purposely putting the property out of the court's possession. This court found in its original judgment denying discharge. See *Matter of Richardson*, 67 B.R. 624, 628, 629 (Bkrtcy.W.D.Mo.1986) ("Further, at least at the outset, before the chattels were sold, the defendants clearly had the ability to grant reclamation to plaintiff. The fact that they did not do so, but instead sold the property and continued—in the face of the existing reclamation order—to utilize the proceeds for their own benefit in itself shows a contumacious violation of the court's orders.") And it is open to the bankruptcy court, on an objection to discharge, to deny discharge for a *past* unexcused ability to perform which accompanied noncompliance. That is why the court has observed that the defendants had a burden of demonstrating a continual inability to pay over the relevant period of time, which they clearly failed to meet. See notes 7 and 8, *supra.* "Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, ..." *Maggio v. Zeitz,* 333 U.S. 56, 64, 68 S.Ct. 401, 405, 92 L.Ed. 476 (1948).

son as a witness. It is true that this court's finding on the issue of credibility was unparticularized and general. But the decisions which govern findings on the issue of credibility recognize the intangible factors of appearance and demeanor upon which such findings must in material part depend and hold such general findings—or even implied findings—to be sufficient.[16] Generally, if the trial court makes findings contrary to the testimony of a witness, it is regarded as a sufficient finding of the absence of credibility of that witness.[17]

Despite these principles, the district court has remanded this action to this court for the purpose of making "findings of fact" as to whether the debtors "reasonably believed that their interpretation of the bankruptcy court's June 21, 1985, order was correct." In making these required

findings, it is clear that the bankruptcy court cannot rely on its prior finding that Ms. Richardson's testimony as to her inability to comply with the turnover order was not credible. For the district court, in sum, has vacated this court's finding that Ms. Richardson's testimony was not credible. Nor can it rely on its former finding that, even if credible, the evidence was insufficient to establish inability to comply. Further, the authorities are clear to the effect that it is improper to conduct a hearing after remand for the sole purpose of granting a party an opportunity to adduce evidence which it simply neglected to adduce in the initial hearing.[18]

■ Nevertheless, the district court's determination that Ms. Richardson's testimony was credible to the effect that neither she nor her husband [19] intentionally violat-

---

16. "(S)o far as the findings of the trial judge who saw the witnesses 'depends upon conflicting testimony or upon the credibility of witnesses, or so far as there is any testimony consistent with the finding, it must be treated as unassailable.'" *Wittmayer v. United States,* 118 F.2d 808, 811 (9th Cir.1941). Even in the absence of an explicit finding on the issue of credibility, "(a)n appellate court must give due regard to the trial court's opportunity to judge the credibility of the witnesses." *Richmond v. Carter,* 616 F.2d 381, 383 (8th Cir.1980). A trial judge's "impressions of the credibility of the witnesses, given before the passage of time had dimmed the memory of what can never be adequately preserved by stenographic record, is thus entitled to great weight." *Mazzella Blasting Mat Co. v. Vitiello,* 250 F.2d 935 (2d Cir.1957). Consequently when, without any express finding of credibility, the court bases its findings on the testimony of a witness or witnesses whose testimony is contradicted by others, the implied finding of credibility has been honored by the courts. *Westcott v. United States Fidelity and Guaranty Co.,* 158 F.2d 20, 23 (4th Cir.1946) ("Obviously, the trial judge believed these last witnesses just listed and did not believe Westcott and Mann.")

17. See note 16, *supra.*

18. "A remand for additional evidence should be sparingly exercised. A court is reluctant to permit litigants to try their cases by piecemeal and continue protracted litigation concerning facts that could have been established at the original trial." 5 Am.Jur.2d *Appeal and Error* section 972, p. 400 (2d ed. 1962). "(W)e see no reason for remanding the case upon the mere chance that the government may be able to furnish evidence which it has failed to furnish ..."

*American Propeller & Mfg. Co. v. United States,* 300 U.S. 475, 480, 57 S.Ct. 521, 523–24, 81 L.Ed. 751 (1937). Further, in this case, the district court did not remand this case for a new trial, but only for the purpose of this court's making "findings of fact." It is the limited office of this court not to go beyond the district court's instructions on remand.

19. Again, with due respect to the district court, it must be observed that the transcript of the hearing of December 18, 1985, does not contain any statement by the defendants to the effect that they did not believe that they were required, by reason of their inability, to comply with the court's turnover order. And again, this contention appears to have been taken from an assertion in the appellate brief which went unopposed or uncorrected by the plaintiff's brief. The transcript of the hearing shows that, when Mr. Jenkins asked Ms. Richardson why "you or Lyle did not comply with the Court's order to pay over the sum of $3,842.89," Ms. Richardson answered as follows: "I had been advised by two of my attorneys that the sale of the calves was not—the calves were not FHA security because it had been three and a half years since I had signed the security agreement with FHA, the cows could not possibly have been carrying those calves in May of 1981 when I had signed the last security agreement with FHA." But this was a defense which had been overruled by the court, in an order which was not appealed, before the duty to turn over this amount was ultimately directed. Insofar as the district court finds it credible, however, the answer purports to apply to a question which inquired into the state of mind of both Nellie Jane Richardson and Lyle Dewayne Richardson.

ed this court's turnover order was credible compels a finding that there is no ground for denial of discharge under section 727(a)(6) of the Bankruptcy Code. For intention is a discrete and indipensable element in any section 727(a)(6) violation.[20] Further, this court, on the basis of the testimony of Nellie Jane Richardson—which the district court has found to be credible—must also find that Lyle Dewayne Richardson did not intentionally violate the court's turnover order. For Ms. Richardson has testified with respect to her husband's absence of intention as well as her own.[21] Insofar as that state of mind must be objectivized by evidence of inability to pay, or insofar as the bankruptcy court may infer the existence of the requisite intention from absence of evidence of inability to pay,[22] this court can only hold, in accordance with the district court decision, that the defendants had no burden to adduce such evidence and that it was instead the plaintiff's duty to produce evidence of solvency, which it did not do. Although this appears to be a reversal of the traditional burden of proof in an action to enforce a turnover order—as has been observed above, the traditional authorities impose that burden on the defendant in turnover—this court must strictly obey the instructions of the district court, and those instructions can carry no other implication except that the defendants' failure to adduce cognizable evidence of insolvency or of inability to pay must be ignored.[23] In this case, then, the defendants' denial of any intention to violate the turnover order reigns supreme and controls and compels the decision to set aside the former order denying the defendants' discharges in bankruptcy. And, when it is usually the debtors who will have a unique ability to produce evidence of their financial status, and the plaintiffs must ordinarily be content to rest on their ability to cross-examine the debtors' witnesses on this issue, it appears that the debtors' denials of any intentional disobedience of turnover orders must prevail in nearly all future cases.

In so finding and concluding, this court recognizes that it is ordinarily the trial court, the bankruptcy court, which ordinarily makes the nearly-unreviewable determination of credibility. The formerly well-established doctrine to this effect has been held to have particular applicability to cases in which the testimony of live witnesses is involved and in denial-of-discharge cases. See this court's former decision in *Matter of Dowell*, 82 B.R. 998 (Bkrtcy.W.D.Mo.1987), to the following effect:

"(T)he bankruptcy court, like any trial court, is free to disbelieve ... testimony on the basis of ... appearance and demeanor. And, under the ordinary standard of review, that determination would not appear to be, under any imaginable usual circumstances, overturnable on appeal. '(T)he District Court (bears) the same relationship to the Bankruptcy Court as (courts of appeal) usually do to the District Courts—it sits as an appellate tribunal, not as a finder of fact. The deference owed by appellate courts to finders of fact is at its highest where the issue turns on resolution (of the testimony of) live witnesses,' *In re Windle*, 653 F.2d 328, 331 (8th Cir.1981), or in gauging the credibility of witnesses in the

---

**20.** An objection under section 727(a)(6) has been denied "when the debtor's failure to comply with an order was (not) due to ... wilful, intentional disobedience or dereliction." 4 Collier on Bankruptcy para. 727.09, p. 727–77 (15th ed. 1988). Thus, if a debtor credibly states that he or she had no intention to violate the order, that may provide a sufficient defense, if the court believes that testimony, as the district court has in this action. Ordinarily, however the bankruptcy court may consider the testimony to this effect in light of the failure to adduce any evidence of inability to comply and, accordingly, may reject it on grounds of credibility. It is too well established to require citation of

authority that a court does not have to accept a party's testimony as to his intention as conclusive on that issue. "Intent of the bankrupt to hinder, delay, and defraud creditors is a subjective issue which may be inferred from circumstantial evidence since it is seldom susceptible to direct proof." *Matter of Keenen,* Civil Action No. 82–5038–CV–SW–4 (W.D.Mo. Oct. 1, 1982).

**21.** See note 19, *supra.*

**22.** See note 20, *supra.*

**23.** See notes 19 and 20, *supra.*

ordinary objection-to-discharge proceeding. 'Because the Referee is in a superior position to make the proper determination of any issue of fact, it has been held that he has broad discretion in granting or denying discharge.' *In re Brown*, 314 F.Supp. 947, 954, 955 (W.D.Ark.1970), affirmed, 444 F.2d 49 (8th Cir.1971)."

The same principles have been said to apply in cases involving turnover orders, in which the defendants with great frequency contend that they neither have the property sought to be turned over nor the ability otherwise to comply with that order by paying over the value of that property. See *Matter of Abesbaum*, 70 F.2d 628, 629 (2d Cir.1934), in which the bankrupt, like the debtors in this case, contended that the property which was the subject of the turnover order was no longer in his possession and that he had no ability to comply with the turnover order:

"The stories of bankrupts who conceal assets have assumed a form almost as conventional as the plots one finds in the plays of Plautus and Terence. Indeed, if they were told with art and possessed more fertility of imagination, a new anthology might be gathered for American literature from the bankruptcy field. As it is, they contain little more than standardized forms of falsehood so often reiterated as to be neither credible nor interesting."

Accordingly, the court in that case affirmed the trial court's finding the explanations were not to be credited.[24]

But, in the action at bar, this court is bound by the ruling on credibility rendered by the district court, not only by reason of this court's profound and genuine respect for the district court, but also by reason of the well-established cardinal doctrine of "law of the case." The applicability and effect of that doctrine has earlier been explained by this court in *Matter of Dowell*, 82 B.R. 998 *supra*, (Bkrtcy.W.D.Mo. 1988), as follows:

"See 1B Moore's Federal Practice, paragraph 0.404(1), p. 118 (2d ed. 1984), to the following effect:

'A Court that makes a decision has the power to reconsider it, so long as the case is within its jurisdiction. But after the law of the case is determined by a superior court, the inferior court lacks authority to depart from it, and any change must be made by the superior court that established it, or by a court to which it, in turn, owes obedience.'

\*     \*     \*     \*     \*     \*

'If circumstances arise that cast doubt on the correctness of the law of the case as established on appeal, arguments in support of departure must be addressed to the appellate court, either in a petition for rehearing, or if the time for filing a motion for rehearing has passed, by motion for recall of the mandate, or on appeal from the judgment after completion of the proceedings for which the case was remanded.' 1B Moore's Federal Practice paragraph 0.404(10), pp. 171–172 (2d ed. 1984)."

This court, therefore, has no alternative except to find that the testimony of Nellie Jane Richardson to the effect that she had no intention to disobey the turnover order of June 21, 1985, was credible and that there is no evidence from which it can be established that the defendants were at any time able thereafter to comply with that order. And, since the district court has remanded this action for further "findings," as opposed to "recommended findings," this court must enter judgment in accordance with those findings. A judgment will therefore be entered setting aside the former denial of discharge and instead granting discharge to the defendants.

*The Alternative Basis for Setting Aside The Former Judgment Denying Defendants' Discharges in Bankruptcy*

The district court's *de novo* review of the credibility determination made by this

---

**24.** Admittedly, however, the trial court in that case was the district court rather than the bank-

ruptcy court.

court constitutes a firm indication that it regards this type of case as a "related" or "non-core" case directly within its own competence as opposed to a "core" proceeding which is within the competence of the bankruptcy court to hear and determine within the meaning of section 157(b)(2), title 28, United States Code. There is significant support for the district court's position in this regard in *In re Sequoia Auto Brokers Ltd., Inc.*, 827 F.2d 1281 (9th Cir. 1987), in which it was held that a civil contempt proceeding was a "related" proceeding which a bankruptcy court may not determine, but rather may only hear and thereafter make recommended findings of fact and conclusions of law to the district court as permitted by section 157(c)(1), Title 28, United States Code.[25] And it has elsewhere been held that an adjudication of contempt is a power to be exercised only by Article III courts, whose business it is to enforce judgments. *Kalaris v. Donovan*, 697 F.2d 376, 388 (D.C.Cir.1983) ("Many of the ... more 'essential attributes of the judicial power' expressly were not vested in the Board ... (for) it must resort to an appropriate District Court to have its orders enforced.")[26] Nevertheless, as this court has above observed, the district court has remanded this related action to the bankruptcy court, not for "recommended findings," but for actual "findings" which must support a new judgment to be issued by this court. Under such circumstances, it is incumbent upon this court to conduct itself in such a manner as not to arrogate Article III powers unto itself. This court has noted on prior occasion the pernicious after-effects which the bankruptcy court's exercise of jurisdiction under such circumstances can have. See, e.g., *Matter of Dowell*, 82 B.R. 998 (Bkrtcy.W.D.Mo.1987), to the following effect:

> "(T)his court has observed that, under the rule fixed by the Supreme Court's

25. "Based on Congress's intent in the 1984 Amendments to cure the overly broad jurisdictional grant to bankruptcy judges in the 1978 Act and our conclusion that bankruptcy judges' exercise of the civil contempt power is not express or implied in the new Congressional enactments, we hold that Congress has not conferred the civil contempt power on bankruptcy judges. We conclude that the bankruptcy judge had no jurisdiction to issue the contempt order. Therefore, the bankruptcy court judge must, as under earlier bankruptcy procedure, certify the facts to the district court to review de novo and determine whether to issue the order." *In re Sequoia Auto Brokers, Ltd., Inc.*, 827 F.2d 1281, 1290, 1291 (9th Cir.1987). This court has formerly, in *Matter of Dowell*, 82 B.R. 998 (Bkrtcy. W.D.Mo.1987), held that this decision effectively ousted the bankruptcy court of "core" jurisdiction to determine a section 727(a)(6) claim, when viewed in tandem with the district court's holding in that case: "There can be little doubt that the power of the bankruptcy court to deny discharge for refusal to obey its lawful orders is a form of a power to enforce or effectuate the bankruptcy court's own judgments. In fact ... the power is a form of the contempt power. It is said that the power under section 727(a)(6)(A) ... to deny discharge is one under which '(c)ontempt of court, provided the order ignored was lawful, provides a basis for an objection to discharge.' 4 Collier on Bankruptcy para. 727.09, p. 727–77 (15th ed. 1987).... If it would peradventure be stated that the provisions of section 157(b)(2)(J) of ... title (28), in confiding 'objections to discharge' to the 'core' jurisdiction of the bankruptcy court, provide a satisfactory statutory basis for the bankruptcy court judg-

ment in this action, even though it must find its basis in contempt powers, the literal language of the court in the *Sequoia* case ... is to a contrary effect:

> 'We are not persuaded that in giving bankruptcy judges authority over core proceedings Congress also gave them contempt power in those proceedings ... Absent indications of congressional intent to confer the contempt power in core proceedings, and in view of Congress's repeal of both sections limiting civil and criminal contempt in the 1978 Act, we refuse to infer the grant of the power in such proceedings. Nor are we convinced that the exercise of the contempt power can be defined as itself a core proceeding ... Justifying the exercise of the contempt power by defining it as a core proceeding ignores the rationale for the core-noncore dichotomy; to avoid the constitutional difficulties created by *Northern Pipeline.*'

827 F.2d at 1289. Further, if the statute does in fact contemplate the determination of section 727(a)(6)(A) cases (by the bankruptcy court), it would run afoul of the imprecation against conferring Article III powers on non-Article III courts, under the district court's interpretation of the standard of review to be applied (that of de novo review of credibility determinations)."

26. In *Kalaris*, the United States Court of Appeals for the District of Columbia limited the "effective holding" of *Marathon* otherwise to a holding that "certain private *state* law claims, when adjudicated within the federal system, must be decided by Article III courts." 697 F.2d at 386. (Emphasis in original.)

decision in *Glidden Co. v. Zdanok*, 370 U.S. 530 [82 S.Ct. 1459, 8 L.Ed.2d 671] (1962), 'it has in the past been held that a court initially created as a non-Article III court may 'mature' into an Article III court by reason of being assigned a portion of the federal judicial power.' *Matter of Richardson*, 52 B.R. 527, 534 (Bkrtcy.W.D.Mo.1985). See also *Kalaris v. Donovan*, 697 F.2d 376, 385 (D.C.Cir. 1985), to the effect that, in determining the proper classification of a court as an Article III court or a non-Article III court, 'it is not what Congress says but what powers Congress vests in the adjudicatory body that counts.' And, in respect of the matter at bar, it would seem that a case having as its character an involvement of the special competence of the district court would constitute a 'related' case which could be assigned to the bankruptcy court for the purpose of entering judgment only at the risk of interpreting the statute to confer Article III powers on the bankruptcy court.... This court has been confronted with similar issues on prior occasions and has, insofar as is possible, declined the opportunity to exercise Article III powers. 'Congress and the higher courts had to be circumspect in delegating powers to the bankruptcy court lest they by indirection confer Article III powers on the bankruptcy court. Accordingly, the bankruptcy court must be circumscript in interpreting the law delegating powers to it lest it be accused of arrogating Article III powers to itself.' *Matter of Richardson, supra,* at 533. 'The bankruptcy courts, under such circumstances, have an interest equal to that of the district court in preventing Article III status from being conferred by accident and without a rational and direct decision by the appropriate branch of Government.' *Matter of Golden Gulf, Ltd.,* 73 B.R. 685, 689 (Bkrtcy.E.D.Ark.1987). It has been the practice of this court, consequently, to decline to exercise such power when it would not be unjust to do so. And that is the case at bar, in which, as observed above, the district court's order of remand has in fact dictated the result in this case and the denial of the complaint objecting to discharge, consequently, may be looked upon either as a declination of jurisdiction or as a determination of the merits contrary to the plaintiff, or both."

Accordingly, in this action, as in the *Dowell* case, *supra,* the court must regard itself as without the power to enter a judgment denying discharge. On this separate and independent ground, therefore, this court cannot deny the defendants' discharges in bankruptcy and its former judgment doing so will therefore be set aside.

*The Discretion of the Bankruptcy Court to Grant a Discharge even though a Ground for Denial of Discharge has been Established*

In examining the briefs of the parties which were filed in the district court, this court has observed that the plaintiff appeared not only, as mentioned above, to admit the sufficiency of defendants' evidence of insolvency, but also to have characterized the denial of discharge under section 727(a)(6) of the Bankruptcy Code as a "harsh remedy" which should only be infrequently employed.[27] It was further thereby suggested that only infrequent employment of the remedy of denial of discharge is necessary to support the functioning of the bankruptcy court.[28] In view of these

---

**27.** Thus, in its "introduction," the brief of the plaintiff states that: "The United States would be the first to admit that the denial of a debtor's discharge for refusal to obey a lawful order of the Court is a harsh remedy—but under some facts even this harsh remedy *is* justified." A remedy which is suited to the facts of a case cannot, however, deserve the label of "harsh." In such instances, the invocation of such a remedy can only be regarded as a form of justice, rather than "offensive to a sense of justice," as

"harsh" is defined to be. See Webster's Second International Dictionary—Unabridged, p. 1142.

**28.** Cf. note 27, *supra.* In the same "introduction," the plaintiff goes further to state that: "It is a rare proceeding when the Court must resort to such a coercive measure. It cannot be argued that the Bankruptcy Court for the Western District of Missouri uses this remedy callously or indifferently. In fact, from 1984 thru 1986 the undersigned is aware of only three (3) instances where the Court felt itself justified in

admissions, it would ordinarily be advisable for the bankruptcy court to fortify its foregoing determination that there is no ground for denying discharge with a determination that, even if there were such a ground, it would still be within the discretion of the bankruptcy court to grant a discharge. "It is commonly said that even when grounds for the denial of discharge exist, it is still within the discretion of the bankruptcy court as to whether discharge should actually be denied." *Matter of Borron*, 29 B.R. 122, 128 (Bkrtcy.W.D.Mo. 1983); *In re Suttles*, 819 F.2d 764, 766 (7th Cir.1987). But, for the foregoing reasons, the court must instead hold that it does not have the power to exercise such discretion; that that power remains in the district court.

■ Further, however, it is the belief of this court that the Government's appellate brief is in error insofar as it suggests that the sanction of denial of discharge need be only infrequently applied to intentional violations of bankruptcy court orders. The opposite is true. The sanction should be applied for each and every proven intentional violation. Otherwise, the altogether pernicious lesson is taught that bankruptcy court orders may be ignored with impunity. As this court has earlier stated in *Matter of Dowell, supra,* "the lesson which not denying the discharge would teach to other debtors is one of gravity and great moment —that they might avoid the obligations imposed upon them by the Bankruptcy Code by averring that they were not conscious of them and that, if they so aver, in all likelihood, the bankruptcy court must accept their statements as true and correct." At least one recent appellate court decision appears to be in agreement. See *United States v. Revie*, 834 F.2d 1198, 1988 CCH Bankruptcy Law Reporter para. 72,152 (5th Cir.1987) ("A proceeding to show cause why a turnover order had not been obeyed falls within the authority granted in 28 U.S.C. section 157. Few functions are more essential to conducting a court than maintaining order and enforcing attendance."). If a bankruptcy court may not have the power to ensure that debtors disclose the existence and location of the assets which, under the law, belong to the estate and the creditors and to ensure that those assets are turned over to the estate, there can be little that bankruptcy courts can do to guard against wholesale abuse of bankruptcy proceedings. This court has previously noted how important that it has become that the bankruptcy court have such powers and that they are exercised so as to make bankruptcy useful to those who in good faith need it. See *Matter of Bruno*, 68 B.R. 101, 103 (Bkrtcy.W.D.Mo.1986), to the following effect:

"The framers of our national constitution penned the bankruptcy power into its articles as one of the most significant— if, indeed, not the most significant—of the protections of our way of life. The fundamental and paramount importance of bankruptcy laws can quickly be grasped if one simply contemplates a system in which each citizen was permitted only one economic life and in which any single economic failure would make one a debtor for life, or nearly so, regardless of the potential future benefits to himself and his society which his industry and innovative genius might otherwise have created. Such a legal system would frustrate and still the creative spirit which lies at the heart of our democratic society. On the other hand, however, if the bankruptcy process is permitted to be abused by those whose purposes are not in consonance with this

---

denying a debtor's discharge because that debtor had refused to comply with a lawful order of the Court. This is true, even though the Court's records reveal that during this time period *over* 14,000 bankruptcy cases were filed in the Western District of Missouri alone! Even if 14 instances of denial of discharge under section 727(a)(6) had occurred, this would represent only one-tenth of one percent of all cases processed by the Court." The sense of this disserta-

tion seems to be that the court regularly tolerates violations of its orders rather than invoke the "harsh" remedy of denial of discharge and that the court can function very well in only denying discharge in a small fraction of those cases in which violations may be involved. The reviewing court may well have asked itself why, then, should a discharge be denied in this case, which involves only approximately $4,000.

ideal, the effect tends to be the same as if proper use of the bankruptcy laws were wholly suppressed. For the bad reputation of the bankruptcy system which thus develops discourages its use by those who would prefer to preserve some semblance of their good name." The critical importance of collecting the estate's assets has been pointed out in view of the fact that "measures may easily be— and regularly are—taken to avoid the collection of nondischargeability decrees," and that, therefore, "the one certain deterrent to abuse of the bankruptcy system is the unfailing collection of the debtor's unencumbered and nonexempt assets." *Matter of Burstein–Applebee Co.*, 63 B.R. 1011, 1019, n. 15 (Bkrtcy.W.D.Mo.1986). As in this action, failure or refusal to turn over such assets may be penalized, if intentional, by denial of discharge, one of the few methods which the bankruptcy court can utilize to deter the abuse of the system which may destroy it. Thus, whereas

courts are sometimes warranted in granting discharges when other grounds for denial of discharge are proven, they can seldom be justified in doing so when intentional violation of bankruptcy court orders is involved. For otherwise, according to the above considerations, the bankruptcy process itself becomes one of little value except as a harbor for those who would hinder, delay and defraud their creditors. But, as indicated above, the exercise of this discretion in bankruptcy matters now belongs to the district court.[29]

Accordingly, it is hereby directed that a decision be entered on even date herewith in accordance with the considerations above stated.

**29.** *The future of bankruptcy court functions.* This case appears to reflect a tendency to place controversies coming before the bankruptcy court in a "noncore" rather than a "core" category. As the decision in *In re Sequoia Auto Brokers Ltd., Inc.*, 827 F.2d 1281 (9th Cir.1987), graphically demonstrates, it is constitutionally the safer thing to do. (There is a potentially contrary holding in *L.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1548, n. 8 (11th Cir. 1986), to the effect that: "If a contempt proceeding were a core proceeding, the bankruptcy court could enter a final contempt order." But that holding is in the subjunctive and *assumes* that a contempt action may be a core proceeding if an order entered by the bankruptcy court in a core proceeding is sought to be enforced.) But the rule has generally been followed that, in the event of any ambiguity, an action should be classified as a "noncore" proceeding. *In re Castlerock Properties*, 781 F.2d 159, 162 (9th Cir. 1986) ("(A) court should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems.") Further, this action appears to demonstrate the inefficacy of the bankruptcy court's making recommended findings of fact when the material issue to be determined is that of credibility. In those cases, use of the report-and-recommendation process, without the district court's conducting a new hearing on the issue, appears not only to offend the litigants' rights to an Article III trier of fact, but also to take little or no account of the ineffable character of a credibility determination. It appears that, in most imaginable instances, the district court would have to conduct

a *de novo* hearing prior to making the determination and that, in those instances, the bankruptcy court's meantime offering recommended findings of fact and conclusions of law will have only resulted in delay in rendering the final decision and a duplication of effort between the bankruptcy court and district court.

If these considerations culminate in the district court's having to hear as well as determine these crucial matters affecting bankruptcy court operations, a workload balance between the district court and bankruptcy court might be achieved by local rules or orders of the district court which expand the bankruptcy court's jurisdiction to hear *and* determine cases which do not come within the prohibition of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). As this court has previously observed, see notes 25 and 26, *supra*, decisional authority has limited the *Marathon* prohibition to (1) actions arising exclusively under state law and (2) actions to effectuate orders or judgments of the bankruptcy court. In a prior opinion, this court has demonstrated how, under section 151, Title 28, United States Code, the district court may expand the jurisdiction of the bankruptcy court to the hearing *and* determination of other types of actions, related or nonrelated, including securities cases, social security disability determinations, civil rights and virtually all other types of actions which neither involve private rights arising exclusively under state law or the effectuation or enforcement of bankruptcy court orders and judgments. See *Matter of Golden Gulf, Ltd.*, 73 B.R. 685, 693, 694 (Bkrtcy.E.D.Ark.1987).